**Helen GELOF, Plaintiff,**

v.

**Louis PAPINEAU, in his capacity as Director of the Delaware Development Office, Defendant.**

Civ. A. No. 83–210 CMW.

United States District Court,
D. Delaware.

Nov. 26, 1986.

Roy S. Shiels, of Brown, Shiels & Chasanov, Dover, Del., for plaintiff.

Michael F. Foster and Regina M. Mullen, Deputy Attys. Gen., Dept. of Justice, Wilmington, Del., for defendant.

CALEB M. WRIGHT, Senior District Judge.

## I. FACTS

In November 1980, shortly after his re-election victory, Delaware Governor Pierre S. du Pont, IV, huddled with his crack political strategists. The purpose of the meeting: to chart a new course for Delaware by creating an omnibus agency that would attract private industry to the State.

The birth of this novel organization, The Delaware Development Office ("DDO"), came amidst intensifying state competition for industrial capital. To steel Delaware for the contest, Governor du Pont drafted one of his closest advisors to play point

man for the reorganization: Nathan Hayward, III.[1]

Hayward, now Senior Vice-President of the Wilmington Trust Company, is a man intensely optimistic about Delaware's ability to compete. Hayward believes that providing "the support and aid" and "the variety of things that private business relies on, [is] something that Delaware [can] do better than many of the other states that it compete[s] with, because we [can] ... tell ... an interested company: 'Yes, you build your plant on that location and we will guarantee that we will have the road widened for you. We will have sewer capacity enough to take care of your industrial needs.' "[2]

While the reorganization of state government excited some, it worried others, notably Delaware's civil servants. The dislocations Delaware's reorganization caused are the subject of this litigation.

Before being tapped to organize the DDO, Hayward was the Director of Delaware's Office of Management, Budget and Planning ("OMBP"). Known as the Governor's "think tank", this office of forty-five employees, prior to 1980, provided the Governor with economic and statistical reports to help him prepare the yearly budget.[3] When the DDO was created, through legislative enactment in 1981, all positions above a certain paygrade at OMBP were abolished and others were transferred to different agencies.[4] After the transfers, the job slots of eight professionals at OMBP were abolished.[5]

Plaintiff, Helen Gelof, was the only one of the eight professionals who did not find a job after the reorganization.[6] She charges defendant, Nathan Hayward, III, with age discrimination for failing to hire her at the new DDO. At all times relevant to this action, defendant Hayward acted as the Director of the DDO.

Helen Gelof became a permanent employee of the State of Delaware on December 16, 1974.[7] Ms. Gelof advanced through the ranks of Delaware's OMBP to become a "Principal Planner" and author of several statistical studies.[8] She worked in state government continuously until her termination on January 31, 1982.[9]

Gelof first received word that there would be changes in state government in early 1981 while reorganization legislation was under consideration.[10] But Hayward subsequently met with the OMBP staff and promised them that none of them would lose employment due to reorganization efforts.[11]

Gelof was notified of her own termination in October 1981, at a meeting with Hayward and his assistant, Grover Biddle.[12] Hayward advised Gelof that after the reorganization he could no longer afford to pay her.[13] Hayward conceded bud-

1. Transcript, Volume 2, Page 347, [hereinafter references to the trial transcript will be shortened to the form: TX-number-for-volume, page number, (witness); e.g., TX2–347 (Hayward).]

2. TX2–365 (Hayward).

3. TX2–342 (Hayward).

4. TX2–358 (Hayward).

5. TX2–369 (Hayward).

6. Pretrial Stipulation, Paragraph 13, page 11, [hereinafter references to the pretrial stipulation will be shortened to the form: Stip., ¶, p.; e.g.: Stip., ¶ 13, p. 11.]

7. Plaintiff's Exhibit 1K, [hereinafter references to exhibits will be shortened to the form: PX–#; e.g., PX–1K]. "State of Delaware Employee Performance Evaluation."

8. Stip. ¶ 3, p. 7.

9. Stip. ¶ 2, p. 7.

10. TX1–84 (Biddle).

11. TX1–35 (Hugg). OMBP staff included 13 Planners. The highest level was that of Principal Planner. Of the three Principal Planners in the office, Gelof was the only female, and, in November 1981, she was 52 years of age. Stip. ¶ 7, p. 9; Stip. ¶ 1, p. 7.

12. TX1–200 (Gelof).

13. TX2–422 (Hayward). *See also,* Stip. ¶ 17, p. 13.

get was a primary factor in his determination as to which employees would be retained by DDO.[14]

Immediately following the October 1981 meeting, Gelof asked to be demoted and transferred to a position with the State Budget Office ("Budget").[15] Gelof sought this downgrade because it would protect her under the State's merit system.[16] Hayward had allowed another Planner to effectuate a similar transfer. For this Planner, Hayward executed the requisite state personnel form; he did not sign a personnel form for Gelof.[17]

Hayward claimed to lack authority to sign the transfer forms. But the State employment rules specifically provide for voluntary demotion under these circumstances, if approved by the appointing authority.[18] The position requested by Gelof at Budget remained vacant until at least July 1, 1983.[19] Hayward never informed the head of the Budget Office that Gelof wanted to transfer to Budget.[20] Defendant Hayward, and his assistant Grover Biddle, eventually placed six of the eight persons whose slots were abolished in state employment; a seventh secured private sector work.[21]

Eight professionals, including Gelof, were temporarily placed in the Delaware Development Office as "exempt" employees who could be terminated without regard to the Merit System.[22] These eight were subsequently terminated. Of these, five were over fifty years of age.[23] The average age of the eight dismissed employees was fifty. The average age of professional employees remaining at DDO after November 1, 1981 was 36.4.[24]

The work performed by DDO's new Data and Information Section was 75 to 80% statistical research and analysis—work

---

14. TX2–420 (Hayward).

15. TX2–407 (Hayward); TX1–201 (Gelof).

16. In Delaware, state government positions protected under the "merit system" cannot be terminated at will. TX1–209 (Gelof). Merit positions are different from "exempt" positions that can be terminated at any time. TX1–210 (Gelof).

17. Stip. ¶ 15, p. 12; TX2–297 (Hayward). Hayward signed several so-called "Personnel Action Forms" ("PAR–3") for OMBP planners who wished to go from their current merit position to another merit position in state government. TX1–106 (Biddle). See PX–3(a) to 3(k). "State of Delaware Personnel Action Request" (PAR–3)." Neither of Hayward's subordinates at OMBP—Hugg or Biddle—signed a PAR form without Hayward's approval. TX2–404 (Hayward).

18. Hayward, as Director of OMBP, had authorization to execute a PAR–3 form and approve a transfer. See PX–19 "State of Delaware, Personnel Office Rules for a Merit System of Personnel Administration." Rule 13.0220 provides: "A transfer of an employee from one agency or department to another must have the prior approval of the present and proposed appointing authorities and Directors." Id. Rules 13.0310 and 13.0312 provide: "A permanent employee may be demoted to a position of a lower grade for which he qualifies ... when an employee voluntarily requests such demotion."

19. Stip. ¶ 12, p. 11.

20. TX1–167 (Decker).

21. When Gelof was dismissed on January 31, 1982, none of the other planners—only two were more senior in rank—were terminated from state service. Stip. ¶ 13, p. 11. Gelof was not the first employee to seek, while the reorganization was under consideration, to transfer from OMBP to another agency while still covered by the Merit System. Hayward or his agents executed the necessary personnel forms for three other planners to transfer. TX1–56 (Stafford); TX1–8 (Easley); see also PX3(B)–3(K). Of the thirteen planners in the former OMBP office, two planners transferred to other agencies before reorganization took place. Another nine employees were transferred to other agencies according to the reorganization plans. Three planners were retained by DDO. Gelof was not placed anywhere. Stip. ¶ 15, p. 12. The only planner not transferred in accord with this schedule asked Hayward to permit her to go to DDO rather than Budget as originally scheduled. Hayward executed the required personnel form to have her transferred. TX2–397 (Hayward); PX–3(b).

22. See note 16, supra. Stip. ¶ 6, p. 8.

23. PX–5(b), "Reply to EEOC Questionnaire Re: Charge No. 031821914."

24. PX–5(a), "Table 1: Average Age of Terminated and Not Terminated."

done at the old OMBP.[25] The new Director for Data and Information, chosen by Hayward, was Gelof's subordinate at OMBP: Douglas Clendaniel, age 32.[26] Work previously handled by Gelof was performed by Clendaniel: budget functions, projections for the Delaware Data Center Program; and census bureau functions (producing population estimates for roads, sewers, etc.). Clendaniel received all his relevant experience under Gelof's training and supervision.[27]

Subsequent to her termination, Helen Gelof inquired into or made applications for thirty-six positions in state government.[28] She was offered only one position comparable to her prior position, which was changed from merit (protected from termination at will) to exempt when it was offered by the Department of Labor in late 1983.[29] The other positions were all below Gelof's former pay grade and income at OMBP. When terminated, Gelof earned $36,291.00 per year.[30] Other positions offered Gelof were for pay at the level of $20,000 per year—55% of her previous salary. None offered merit protection.[31]

Gelof began work in a family business in early 1983 earning $15,000 annually.[32] She continued, however, looking for state and private employment. At the time of her termination, Gelof's pension had not yet vested.[33]

## II. DISCUSSION

Plaintiff Gelof brought suit under 29 U.S.C. § 626(c) which authorizes civil suits by persons alleging dismissal or other grievances within the ambit of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621–634. Gelof alleges that her employer, Nathan Hayward, dismissed her from OMBP and refused to hire her at DDO because of his policy of replacing senior employees with younger workers.

Plaintiff seeks relief in the form of reinstatement with back pay and other benefits, or, in the alternative, damages in the amount of future lost wages.

This Court held a non-jury trial on May 19 and 20, 1986.

### A. The Burden of Proof.

The ADEA proscribes discrimination against any individual between ages forty and seventy with respect to "compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a); see id. § 631(a). To recover, "a plaintiff must prove by a preponderance of the evidence that age was a determinative factor in the employer's decision." *Dreyer v. Arco Chemical Co.*, 801 F.2d 651, 653 (3d Cir., 1986).

The ADEA's remedial purpose closely resembles the statutory scheme developed by Congress to remedy discrimination based on race, color, religion, sex or national origin.[34] Federal courts, therefore, broadly

**25.** Stip. ¶ 19, p. 10.

**26.** Deposition of Douglas Clendaniel, (Nov. 2, 1983), at p. 10.

**27.** Deposition of Douglas Clendaniel, at pp. 17–18; TX2–365 (Hayward).

**28.** TX2–209 (Gelof).

**29.** TX2–210 (Gelof). The position was with the Department of Labor.

**30.** Stip. ¶ 3, p. 7. Gelof was employed at pay grade 29, step 6 with a monthly salary of $3,024.25.

**31.** TX1–136 (Biddle). *See also* DX–13, "Offer of Employment in a Planner IV Position.". Gelof was offered a job, found through Hayward's assistant, Grover Biddle, in March 1982, but only on condition that she take a 45% pay cut. TX2–301 (Pollack). If Gelof had accepted the job, she would have been precluded from the more commensurate salary positions for which she was then under active consideration and for which she had a right of first refusal under the reorganization legislation. TX1–136 (Biddle).

**32.** TX1–211 (Gelof).

**33.** TX1–213 (Gelof). Plaintiff had eight years of state government service. It takes ten years for the pension to vest. Once becoming re-employed, it takes another five years to vest.

**34.** *Compare* 29 U.S.C. §§ 623(a)(1), (2), *with* 42 U.S.C. §§ 2000e–2(a)(1), (2). *See also Oscar Mayer & Co. v. Evans*, 441 U.S. 750, 756, 99 S.Ct. 2066, 2071, 60 L.Ed.2d 609 (1979) (parallel sec-

endorse the application to ADEA cases of the "shifting burden" analysis developed in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), in the context of racial discrimination under Title VII of the 1964 Civil Rights Act. *See Grant v. Gannett Co., Inc.,* 538 F.Supp. 686, 688 n. 2 (D.Del.1982), *aff'd. without opp., Grant v. News-Journal Co.,* 696 F.2d 982 (3d Cir.1982), (and cases cited therein). The Third Circuit adopts the *McDonnell Douglas* standard, as elaborated in subsequent Supreme Court cases, and applies it to ADEA cases. *Id.* at 688 n. 5.

█ The standard allocates the shifting burden of proof in the following three step fashion: (1) the plaintiff bears the burden of first establishing a prima facie case of unlawful discrimination; (2) if the plaintiff succeeds in making out the prima facie case, then the burden shifts to the defendant to articulate some legitimate, nondiscriminatory reason for the employer's rejections; and (3) if the employer articulates such a reason, the burden of production then shifts back to the plaintiff who must establish either that the employer's proffered reason is a pretext or that the employer's decision was more likely motivated by some discriminatory reason. *See Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 256, 101 S.Ct. 1089, 1095, 67 L.Ed.2d 207 (1981); *Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d 1393, 1395 (3d Cir.), *cert. denied, Wheeling Pittsburgh Steel Co. v. Duffy,* 469 U.S. 1087, 105 S.Ct. 592, 83 L.Ed.2d 702 (1984).

█ Plaintiff's burden of showing pretext merges at the final stage with the ultimate burden of persuading the Court that the employee has been the victim of intentional discrimination. The employee may succeed in this either directly by persuading the Court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Berndt v. Kaiser Aluminum & Chemical Sales, Inc.,* 789 F.2d 253, 256 n. 2 (3d Cir.1986) (citations omitted).

### B. The Prima Facie Case.

The *McDonnell Douglas* approach suggests that plaintiff has the initial burden of establishing a prima facie case of unlawful discrimination by a preponderance of the evidence. This requires a showing that the plaintiff "is a member of the protected class and that he was laid off from a job for which he was qualified while others not in the protected class were treated more favorably." *Berndt v. Kaiser Aluminum & Chemical Sales, Inc.,* 789 F.2d at 257, *quoting Massarsky v. General Motors Corp.,* 706 F.2d 111 (3d Cir.), *cert. denied,* 464 U.S. 937, 104 S.Ct. 348, 78 L.Ed.2d 314 (1983).

█ A prima facie case will be made out if: (1) plaintiff belonged to the protected class; (2) he applied and was qualified for the position; (3) he was not appointed despite his qualifications; and (4) the position was ultimately filled by a younger employee. *Grant v. Gannett Co., Inc.,* 538 F.Supp. at 688.[35]

Plaintiff Gelof—age fifty-two in 1981—belongs to the protected class of people aged forty to seventy. She applied for a position as Director for Data and Information of the newly formed DDO. She was qualified for this position because, as admitted by defendant Hayward, 80% of this job is devoted to statistical work—the same type of work performed by Gelof at her old position of Principal Planner at OMBP. Gelof was not appointed to the new DDO job despite her qualifications. The position was ultimately filled by a younger planner,

tions of ADEA and Title VII should be similarly interpreted), *on remand Evans v. Oscar Mayer & Co.,* 608 F.2d 183 (8th Cir.1979).

**35.** *See also Smithers v. Bailar,* 629 F.2d 892, 895 (3d Cir.1980); *Elliott Group Medical & Surgical Service,* 714 F.2d 556, 565 (5th Cir.1983) *reh'g. denied,* 721 F.2d 819 (5th Cir.1983), *cert. denied,* 467 U.S. 1215, 104 S.Ct. 2658, 81 L.Ed.2d 364 (1984); *Maxfield v. Sinclair International,* 766 F.2d 788, 792 (3d Cir.1985), *cert. denied,* —— U.S. ——, 106 S.Ct. 796, 88 L.Ed.2d 773 (1986).

Douglas Clendaniel, age 32, whom Gelof had trained and supervised at the OMBP.[36]

### 1. Qualification As Part Of The Prima Facie Case

Defendants contend that plaintiff failed to establish a prima facie case because she was not qualified for the job. Defendants rely exclusively on Hayward's assertion that Gelof was not competent for the new DDO position.[37]

■ But this Court has never ruled that an employer's evaluation is the sole benchmark for determining a plaintiff's capabilities. Like Title VII, the ADEA is a remedial statute crafted to eliminate discrimination in the workplace. "The evidentiary rules of *McDonnell Douglas* should not be so mechanically applied as to interfere with the overall purpose of the ADEA." *Grant v. Gannett*, 538 F.Supp. at 689. Requiring plaintiff to prove, as part of her prima facie case, that she preclude even the possibility of dismissal for lack of qualification—based only on employers' expectations—would frustrate the purpose of the ADEA. It would require plaintiff, in effect, to prove pretext. *Grant*, 538 F.Supp. at pp. 689–690. An employer's claim that the plaintiff was not qualified should not preclude the plaintiff from making out a prima facie case.[38]

### 2. Gelof's Prima Facie Qualifications

Gelof held the post of Statistical Planner, and then OMBP Principal Planner, for almost eight years. She advanced through successively more difficult positions. During that period, Gelof received regular salary increases and promotions. Her recommendations were outstanding and she received written commendations from her su-

pervisor and even from the Governor of Delaware.[39]

■ This Court recognizes that qualification is not a static concept. *Kephart v. Instit. of Gas Tech.*, 630 F.2d 1217, 1219 (7th Cir.1980), *cert. denied*, 450 U.S. 959, 101 S.Ct. 1418, 67 L.Ed.2d 383 (1981). Gelof may well have been qualified for her job as Principal Planner at OMBP, yet unqualified to fill the position of Director for Data and Information at the DDO. But the person selected to become Director for Data and Information—Clendaniel—previously worked under Gelof and had been trained by Gelof. Gelof handled her duties at the OMBP with sufficient confidence to "justify some explanation on the part of the employer." *Wilson v. Sealtest Foods Div.*, 501 F.2d 84, 87 (5th Cir.1974). This is all the more true because defendant concedes that 80% of the duties of Clendaniel as Director of DDO were devoted to statistical work of the nature he performed under Gelof at OMBP.[40]

Plaintiff has established a prima facie case for age discrimination.

### C. Rebutting The Prima Facie Case.

After a plaintiff constructs a prima facie case, the burden shifts to the defendant to rebut the adverse inference by articulating "some legitimate, nondiscriminatory reason for the employee's rejection." *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. at 1093; *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978). The defendant need not persuade the Court that it was actually motivated by the proffered reasons. It is sufficient if the defendant's evidence raises a genuine issue of fact as to whether it discriminated against the plaintiff. *Texas*

---

**36.** *See* notes 25–27, *supra*, and accompanying text.

**37.** Defendants' Opening Post-Trial Brief at 13–14.

**38.** *See Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 254 n. 7, 101 S.Ct. at 1094 n. 7; *Burris v. Davidson Transfer & Storage Co.*, 527 F.Supp. 930 (D.Del.1981).

**39.** (Letter of Commendation from Governor of Delaware, January 16, 1981). *See also* PX–13, 14, 16; TX1–22–26 (Hugg).

**40.** *See* note 25, *supra*. Stip. ¶ 10, p. 10; Deposition of Clendaniel at 17–18.

*Dept. of Community Affairs v. Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094.

Defendant Hayward articulates two reasons for rejecting Gelof for the DDO position. First, Gelof's salary of over $36,000 exceeded the amount the reorganization budget would allow Hayward to pay DDO's Director of Data and Information.[41] Gelof was informed of this at a meeting in late October 1981.[42]

The second reason advanced involves a change of functions at DDO resulting from a governmental reorganization which eliminated those functions that could be performed by plaintiff.[43] A correlative reason—advanced only after this litigation was commenced—was that the new job could not be "performed by someone like plaintiff who was most comfortable working in her office by herself with the door closed." Hayward did not judge plaintiff to be the type of "aggressive, positive thinking, interactive person the Development Office needed to meet the substantial responsibilities of its mission: 'recruiting and retaining business for Delaware.' "[44]

█ After plaintiff has made out her prima facie case, the burden that shifts to defendant is only a burden of production, not persuasion. The burden of production means only that unless the party produces some evidence that a fact exists, the judge must find that the fact does not exist. F. James & G. Hazard, *Civil Procedure* § 7.9 p. 244 (2d ed. 1977).

█ Hayward's testimony meets this burden. With regard to reason one—he could not afford Gelof—and reason two—the DDO had different functions—Hayward's testimony is corroborated. Hayward's third reason, that Gelof was not a type of person he sought, was offered only during litigation and lacks credibility.

### D. Evidence of Pretext.

Once the defendant satisfies the requirement of articulating a non-discriminatory

reason for the employee's discharge, the ultimate burden remains with the plaintiff to prove to the trier of fact that the defendant intentionally discriminated against plaintiff. *Burdine,* 450 U.S. at 252–53, 101 S.Ct. at 1093–94; *Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d at 1395; *McDonnell Douglas Corp. v. Green,* 411 U.S. at 793, 93 S.Ct. at 1820; *Berndt v. Kaiser Aluminum & Chemical Sales, Inc.,* 789 F.2d at 256 n. 2.

Plaintiff's burden of showing pretext merges at the final stage with the ultimate burden of persuading the Court that the employee has been the victim of intentional discrimination. The employee may succeed in this either directly by persuading the Court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence. *Berndt,* 789 F.2d at 256 n. 2, *quoting Duffy v. Wheeling Pittsburgh Steel Corp.,* 738 F.2d 1393, *citing Texas Dept. of Community Affairs v. Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095.

A plaintiff can meet his ultimate burden of persuasion with respect to a fact if the plaintiff has produced enough evidence to lead the trier of fact "to believe that the existence of [a fact] is more probable than its non-existence." F. James & G. Hazard, *Civil Procedure* § 7.9 p. 244 (2d ed. 1977).

The Third Circuit defines plaintiff's ultimate burden of persuasion as requiring a specific factual inquiry:

> But when the defendant fails to persuade the district court to dismiss the action for lack of prima facie case, and responds to the plaintiff's proof by offering evidence of the reason for the plaintiff's rejection, the fact finder must then decide whether the rejection was discriminatory within the meaning of Title VII. At this stage, the McDonnell-Burdine presumption "drops from the case," 450 U.S. at 255 n.

---

**41.** TX2–422 (Hayward).

**42.** Stip. ¶ 17, p. 13.

**43.** *Id.*

**44.** Defendants' Opening Post-Trial Brief at p. 15; Stip. ¶ 17, p. 13.

10 [101 S.Ct. at 1095 n. 10] and "the factual inquiry proceeds to a new level of specificity." *Id.* at 255 [101 S.Ct. at 1095], *quoted* in *United States Postal Services Board of Governors v. Aikens,* 460 U.S. 711, 714–715 [103 S.Ct. 1478, 1481–1482, 75 L.Ed.2d 403] (1983), *quoted with approval in Berndt v. Kaiser Aluminum & Chemical Sales, Inc.,* 789 F.2d at 257.

Plaintiff Gelof offered into the record ample evidence that the reasons proffered by Hayward for Gelof's termination are not credible.

### 1. *Pretext One: Plaintiff's Salary Was Too High*

█ In the context of the ADEA, "federal courts have held that economic savings derived from discharging older employees cannot serve as a legitimate justification under the ADEA for an employment selection criteria." *Marshall v. Arlene Knitwear, Inc.,* 454 F.Supp. 715, 728 (E.D.N.Y. 1978), *aff'd. in pertinent part without opinion, and rev'd. in part without opin-*

 *ion,* 608 F.2d 1369 (2d Cir.1979), *quoted with approval in Geller v. Markham,* 635 F.2d 1027, 1034 (2d Cir.1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981).[45]

In *Marshall,* defendant dismissed plaintiff because of her higher salary and pension benefits. The court found that, *ceteris peribus,* the termination of someone because of their salary constitutes age discrimination. "The evidence compels the conclusion that the savings in salary and the unpaid pension benefits accruing to defendants as a result of [plaintiff's] discharge were the controlling economic factors behind her termination. Since such economic factors are directly related to age, [defendants'] reliance on them to discharge [plaintiff] constitutes age discrimination." *Id.* at 730.[46]

Hayward specifically indicated that a principal reason for not hiring Gelof was that she was too costly.[47] Gelof was close to pension vesting which would have substantially increased the cost of employing her.[48]

---

**45.** *See Laugesen v. Anaconda Co.,* 510 F.2d 307, 316 (6th Cir.1975) ("Since it was obvious that economic conditions had to play an important part in the decision, it was vital for the jury to know that this alone would not dispose of the case if Laugeson's age induced Anaconda to discharge him instead of someone else."). *See also Dace v. ACF Industries, Inc.,* 722 F.2d 374 (8th Cir.1983), *adhered to, supp. opinion, reh'g. denied,* 728 F.2d 976 (8th Cir.1984); *Coates v. National Cash Register Co.,* 433 F.Supp. 655, 661 (W.D.Va.1977); *LaChapelle v. Owens-Illinois, Inc.,* 513 F.2d 286 (N.D.Ga.1970).

**46.** *See also Leftwich v. Harris-Stowe State College,* 702 F.2d 686 (8th Cir.1983); *EEOC v. County of Los Angeles,* 531 F.Supp. 122 (D.C.Cal. 1982); *Franci v. Avco Corp.,* 538 F.Supp. 250 (D.C.Conn.1982); *Kerwood v. Mortgage Bankers Ass'n of America, Inc.,* 494 F.Supp. 1298 (D.Ct.D. C.1980).

**47.** TX2–422 (Hayward). Deposition of Hayward, p. 58.

**48.** Plaintiff may also have a case for discrimination based on disparate impact analysis. This mode of analysis is borrowed from the Civil Rights arena, where the Supreme Court holds that a showing of disparate impact alone is sufficient to establish unlawful discrimination under Title VII. *Griggs v. Duke Power Co.,* 401

U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971). The Second Circuit expressly recognizes the disparate impact doctrine in the ADEA context. *Geller v. Markham,* 635 F.2d 1027 (2d Cir.1980), *cert. denied,* 451 U.S. 945, 101 S.Ct. 2028, 68 L.Ed.2d 332 (1981).

But the Third Circuit "has never ruled on whether a plaintiff can establish a violation of the Act by showing disparate impact alone." *Massarsky v. General Motors Corp.,* 706 F.2d 111, 121 (3d Cir.1983), (noting in *dicta* that plaintiff was not entitled to relief under the disparate impact doctrine, even if that doctrine applied). This Court will not decide the disparate impact question, but will perform the same analysis rendered in *Massarsky.*

To establish a prima facie case under the disparate impact model, the plaintiff must show "that the facially neutral employment practice had a significant discriminatory impact." *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). "If that showing is made, the employer must then demonstrate that 'any given requirement [has] a manifest relationship to the employment in question,' in order to avoid a finding of discrimination.... Even in such a case, however, the [employee] may prevail, if he shows that employer was using the practice as a mere pretext for discrimination." *Massarsky, supra,* at 120. The employer's burden of justifying the employment practice does

### 2. Pretext Two: Plaintiff Lacked Skills To Perform At DDO

[9] Defendants' second explanation for the termination of Helen Gelof—that she could not perform at DDO—lacks credibility given the testimony of her colleagues, the outstanding written evaluations she received, and the excellent evaluation that defendant Hayward himself gave her.

When Gelof was first notified of her dismissal in 1981, the only reason Hayward offered was lack of funds. The first time that Hayward raised any concerns about Gelof's ability to perform in the new agency was after litigation commenced in April 1983.[49] This post hoc rationalization of Gelof's termination casts doubt upon defendants' credibility.

Defendants' first contention is that DDO's functions would be significantly different than those of OMBP.[50] The record before the Court does not reveal a drastic change in the tasks performed by DDO's Data and Information Division as opposed to the functions performed by the statistical branch of OMBP. According to DDO's organization chart, the Data and Informa-

tion function was separate from other functions in DDO such as "Business Development", "Business Finance", and other divisions that may have required "people" skills.[51]

Most importantly, 75% to 80% of the work done by Clendaniel as the Director of DDO's Data and Information Office, was precisely the work Gelof had performed at OMBP.[52] Much of the work formerly performed by Gelof at OMBP is still performed at DDO: Capital Budget functions[53]; census bureau functions[54]; and projections for the Delaware Data Center Program.[55] The only thing that changed at the DDO was from an emphasis on supplying data to other state agencies to an emphasis on assisting private sector entities considering locating in Delaware.

Defendants' second contention, related to the first, is that plaintiff Gelof, age 52, did not have the skills to perform the job ultimately given to Clendaniel, age 32. In claiming that Gelof was not qualified to meet the DDO's needs, defendants argue that plaintiff could not perform well in the "recruitment and selling process" and that

---

not arise until after the plaintiff has made out a prima facie case. *Albemarle Paper Co. v. Moody,* 422 U.S. 405, 422, 95 S.Ct. 2362, 2373, 45 L.Ed.2d 280 (1975).

To establish a prima facie case of discriminatory impact, the plaintiff must show that the employer's selection process results in unfavorable treatment of a disproportionate number of members of the protected group to which the plaintiff belongs. *See Dothard v. Rawlinson,* 433 U.S. 321, 329, 97 S.Ct. 2720, 2726, 53 L.Ed.2d 786 (1979).

Because the ADEA only prohibits discrimination against employees between the ages of 40 and 70, Gelof has to show a disproportionate effect on individuals in that age group. Plaintiff has made out a prima facie case based on disparate impact analysis. Plaintiff's economic expert demonstrated that of the people Hayward terminated at DDO, allegedly for budget reasons, the decision to terminate had a disproportionate impact on the elderly. The average age of the eight professional planners terminated by Hayward was 50. The average age of those not terminated—eighteen—was 36.4. *See* PX–8(a) "Average Age of Terminated and Not Terminated". *See also* PX–20 and PX–21 (Vita of Plaintiff's economic expert, Dr. Bernard Siskin). *See also* TX2–250 (Siskin) (testimony that his findings of disparate impact were statistical-

ly significant). *See also Hazelwood School District v. United States,* 433 U.S. 299, 311 n. 17, 97 S.Ct. 2736, 2743 n. 17, 53 L.Ed.2d 768 (1977).

In response to plaintiff's prima facie case, defendants counter that cost considerations bear "a manifest relationship to the employment in question." But Gelof may still prevail if she proves that cost considerations are mere pretexts for discrimination. This analysis is the same as that conducted, *supra,* at notes 45 through 47 and accompanying text.

49. Stip. ¶ 17, 18, p. 13.

50. Defendants' Opening Post-Trial Brief at pp. 14–15. Defendants' Answering Post-Trial Brief at pp. 8–9.

51. PX–10 ("Delaware Development Office Organization Chart").

52. Stip. ¶ 10, p. 10.

53. TX2–365 (Hayward).

54. PX–17 "Memo from Hayward to Gelof, 10/29/81."

55. TX1–25 (Hugg); PX–16 "Letter from Hugg to Gelof, 1/22/81."

she was not flexible and could not "work with consultants or produce quick, focused responses to inquiries from businesses and other public sector agencies." Finally, defendants argue that "the fact that she was a statistician and had produced voluminous reports did not mean that she could work" in the new DDO.[56]

Defendants' argument is contradicted by their own testimony. First, as noted, the statistical work was much of what Clendaniel did at DDO. Second, when asked during cross-examination why Clendaniel was more qualified for the DDO position than Gelof, Hayward cited as a principal reason that Clendaniel had produced the Delaware Data Book—a compilation of statistics for private industry.[57] This was similar to the "voluminous statistical reports" that Gelof and Clendaniel had worked on at OMBP. First, defendants argue that statistical work of length would not be important at DDO; then defendants cite the ability of Clendaniel to do this work as evidence of his superior ability.

Further, Clendaniel had no experience in the planning area, nor as a manager, except that imparted to him by Gelof. Clendaniel's lower paygrade and pay indicate that the Data and Information Section was not more difficult than the job Gelof had at OMBP. Gelof, in fact, at OMBP, made more presentations to gathered audiences than had Clendaniel.[58] Hayward himself could not recall any time that he had seen or been impressed by a presentation made by Clendaniel at OMBP.

Defendants' contention that plaintiff was not flexible or could not respond to different situations is belied by the positive performance evaluations given Gelof by Hayward. Plaintiff received five years of "outstanding" evaluations—the highest available in state government. Hayward had this to say about plaintiff's performance: "Helen has consistently displayed the most thorough and professional approach to her work that I could possibly envision"[59]; "Helen has shown consistent excellence in the quality of her work."[60] Commenting on plaintiff's flexibility, Hayward noted: "I know she will meet deadlines, anticipate problems in advance."[61]

Plaintiff produced several lengthy statistical publications including "Dimensions on Delaware".[62] She also produced shorter reports including the Data Center Newsletter, and the Delaware Economic Indicators, indicating an ability to respond to shorter requests.[63] Hayward characterized "Dimensions on Delaware" as a "first class job."[64]

Contrary to defendants' assertions, the record also demonstrates Gelof's ability to work with people. Plaintiff received written commendations for her work in helping organize an "Economic Outlook" forum in Washington, D.C.[65] Plaintiff demonstrated an ability to respond to short requests including, for example, her preparation of a speech for the Governor.[66] She was com-

---

**56.** Defendants' Answering Post-Trial Brief at p. 9.

**57.** TX2–429 (Hayward).

**58.** TX1–196 (Gelof).

**59.** PX–1(e) "State of Delaware Employee Performance Evaluation 12/16/77—By Nathan Hayward III."

**60.** PX–1(b) "State of Delaware Employee Performance Evaluation 8/11/80—By Nathan Hayward III."

**61.** PX–1(c) "State of Delaware Employee Performance Evaluation 12/14/79—By Nathan Hayward III."

**62.** Memorandum from Hayward to Gelof, 11/19/80.

**63.** PX–17, Memo from Hayward to Gelof, 10/19/81.

**64.** Note 62, *supra.*

**65.** PX–14 "Letter from David Nixon, Chase Econometrics, to Gelof, 12/12/80."

**66.** PX–15 "Letter from Governor Du Pont to Gelof, 1/16/81."

mended by her acting supervisor for having an ability to deal with people.[67]

Any indication that plaintiff could not work with people is belied by the testimony of Gelof's co-workers. Acting Director Hugg specifically testified that Helen has "a genuine feeling for and capability in dealing with people and her employees...."[68] Her colleagues Stafford and Murray also believe she was a "team player" and a good manager, and could rapidly complete assigned tasks.[69] The testimony of Planner Murray, who was closest to Gelof, is most damaging to defendants' case. Murray testified that Gelof could and would adjust to the new work of the DDO.

The only contrary evidence presented was the oral testimony of Hayward and his subordinate Biddle. But good evaluations, testimony of co-workers, and memos quoting superior performance can rebut oral allegations of shortcomings such that challenges to performance can be regarded as pretextual. *Reeves v. General Foods Corp.*, 682 F.2d 515, 523–24 (5th Cir.1982).

Defendants misinterpret the opinion handed down by this Court in *Grant v. Gannett Co., Inc.*, 538 F.Supp. 686 (D.Del. 1982). *Grant* did not stand for the proposition, as defendants maintain, that a plaintiff becomes unqualified for a position once the position has been redefined through a reorganization.

*Grant* remains narrowly limited to its facts. In *Grant*, there was substantial evidence—gathered from sources other than defendant—that plaintiff was unwilling to participate in a new management style and organization. *Grant* 538 F.Supp. at 692–93. There is no such evidence presented in the case at bar.

The *Grant* court in no way held that mere reorganization of a business or organization is sufficient to demonstrate that an employee is not qualified for the new position. Rather, *Grant* looked only at the central question of whether "age is a determinative factor in employment decisions." *Grant* at 692. This requires a weighing of the evidence under the *McDonnell* standards and reorganization remains one of many factors. To hold otherwise would be to paint with too broad a brush and would allow employers to avoid age discrimination suits merely by claiming reorganization. Takeovers, mergers, buyouts, spin-offs, consolidations and leveraged deals are so common in the modern era that to permit organizational restructuring to sanction the dismissal of elderly workers would promote invidious discrimination.

Another distinction from *Grant* is that in this context, Hayward admitted that Gelof would have worked just as energetically as Clendaniel and would have been just as motivated.[70] The alleged lack of ability to adjust to new requests appeared nowhere in Gelof's evaluations.[71] She never failed to meet deadlines or anticipate problems, but rather was complimented on both.[72] She adjusted well to new areas of responsibility, leading to a continuing increase of her responsibilities.

Added to the detailed evidence presented in this case to show that defendants' reasons for firing plaintiff were pretextual, is positive evidence of age discrimination. Five of the eight people terminated from DDO in January 1982 were over fifty.[73] For those professional employees remaining at DDO, the average age was thirty-six.

For the foregoing reasons, this Court holds that Hayward's reasons for firing Gelof are pretexts for age discrimination. Defendant Hayward, therefore, acting as

---

67. PX–16 "Letter of Recommendation from Hugg, 1/22/81."

68. TX1–25 (Hugg).

69. TX1–66 (Stafford); TX1–60 (Murray).

70. TX2–435 (Hayward).

71. TX2–434 (Hayward).

72. PX–1(c) "State of Delaware Employee Performance Evaluation 12/14/79—By Nathan Hayward III."

73. TX1–204 (Gelof).

the Director of the DDO, is liable for violating the ADEA.

### 3. *Affirmative Evidence of Discrimination*

Added to the evidence of pretext, is substantial evidence of discrimination based on Hayward's failure to refer Gelof for another job. After the government reorganization was passed, in October, 1981, all positions above a certain level at OMBP were abolished and the DDO was created. The reorganization plan transferred prior tasks performed by one of plaintiff's peers, Bonnie Anderson, to the already established Office of the Budget—an office that survived the reorganization legislation. Ms. Anderson, however, decided not to accept the change in position.[74] Instead, she accepted an offer from Hayward to work at the DDO.

Once Anderson's prior job slot at OMBP was given (without Anderson) to the Budget Office by the passage of the reorganization act, the Budget position remained open for almost a year.[75] Gelof asked Hayward to be demoted to a Planner V position (from Planner VI) so she could take the newly created Budget job. The Budget position was preferable to Gelof because it was a protected merit position, unlike those offered at DDO.

Gelof claims that Hayward discriminated against her by (1) failing to recommend her to a Budget office position that was located in the same building, immediately down the hall from OMBP;[76] and (2) by refusing to sign a personnel form (the PAR-3) to transfer her to the Budget position.

Defendants note, for example, that they were so concerned with Gelof's loss of her job that he told his assistant, Biddle, with tears in his eyes, to "find her a damn job."[77] Hayward later stated, however, that he never even asked Biddle about whether he in fact had the authority to transfer Gelof.[78] By his own admission, after speaking with Gelof about her desire to take the position in Budget, Hayward "did nothing more for plaintiff" in the way of helping her to find another job within state government.[79]

Gelof specifically stated that on the day she was terminated, January 31, 1982, she met with Hayward and expressed a willingness to accept a lower paygrade, down to a Planner V position. Hayward[80] and Biddle[81] both recall that Gelof asked to be demoted and then transferred. Hayward claims to have told Gelof at this termination conversation that he lacked authority to transfer.[82] But Biddle's testimony reveals no such comment was made.[83] And Biddle was never asked by Hayward about this point:

Q. Did you ask Mr. Biddle: "Can I do this? Can I sign the paper seeming to forward her to this other agency when I know she's at a higher level here than that job over there? Even if she can do it, can I sign this?"

Did you ask him that or anything like it?

A. I can't recall.

Q. Did you call Personnel or contact them to see if you could carry out this transfer in that manner?

A. I left the problems of the administration of the transfer of existing employees and the relocation of so-called displaced employees in Mr. Biddle's hands.[84]

Defendants' assertion that he did not have the authority to transfer Gelof lacks

---

**74.** TX1–18 (Easley). Defendants' Opening Post-Trial Brief at p. 8.

**75.** TX1–167, 179 (Decker).

**76.** TX1–170 (Decker).

**77.** TX1–116, 121 (Biddle); Defendants' Opening Post-Trial Brief at 5.

**78.** TX2–412 (Hayward).

**79.** Defendants' Opening Post-Trial Brief at p. 9.

**80.** TX2–408 (Hayward).

**81.** TX1–83 (Biddle).

**82.** TX2–406 (Hayward).

**83.** TX1–116 (Biddle).

**84.** TX2–412 (Hayward).

credibility given that he never asked his subordinate, Biddle, about the extent of his powers.

Hayward also evinced discriminatory behavior by failing to notify Henry Decker, head of Budget, that Gelof wanted to be demoted and then transferred to a merit position at the Budget Office. Hayward claims to have advised Decker of Gelof's desire.[85] But this is contradicted by Decker's lack of knowledge that Gelof wanted a position in Budget.[86] Decker noted in testimony that the vacant position in Budget remained open for almost a year after the reorganization of state government.[87] In Decker's words: "We would have filled them with anyone experienced, although we did not conduct a recruitment effort to fill them."[88] It seems incredible that Hayward never notified Decker of the Budget Department, whose office was located on the same floor, of the same building, that Gelof desired a job.[89]

According to procedures established at the time, if Decker had given his authorization, as department head, and Hayward had agreed to the transfer, Gelof could have been transferred.[90] Hayward's assertion that he has no authority to transfer Gelof must be disregarded because he never inquired as to what his authority was. Moreover, Hayward had given his permission to other employees from OMBP who sought to transfer to other agencies protected by the Merit System. Planners Easley, Stafford and Anderson—all younger employees—did so. In each case, Hayward executed the necessary personnel documents—the so-called Personnel Action Request Forms.[91] These forms were either signed by Hayward or his assistants Biddle and Hugg. But the latter two never signed without Hayward's knowledge and approval.[92]

Hayward has explicit authority to demote Gelof, as she requested, to a lower grade, so that she could transfer to a lower Planner V position at Budget. The State's Personnel Office Merit System rules explicitly provide that:

[A] permanent employee may be demoted to a position of a lower grade for which he qualified for any of the following reasons: When an employee would otherwise be laid off because his position is being abolished ... When an employee voluntarily requests such demotion.[93]

Hayward, however, claims not to be aware of the voluntary demotion rule that would have allowed him to honor Gelof's request.[94] This assertion was made despite the fact that Biddle recognized that this type of demotion is done all the time.[95]

The facts in this case parallel a recent district court opinion. In *Jacobson v. Pittmen-Moore, Inc.,* 582 F.Supp. 169 (D.Minn. 1984) *later proceeding,* 624 F.Supp. 937 (D.Minn.1985), *aff'd. without opinion,* 786 F.2d 1172 (8th Cir.1986), plaintiff prevailed in an age discrimination action when defendant refused to transfer an elder employee, while transferring two younger employees. In that case, 51 year old Doris Jacobson was terminated because her position was abolished during reorganization. Shortly thereafter, Jacobson requested a transfer. She was denied transfer even though two younger employees, in similar positions, were transferred. The failure to transfer was taken by the court as evidence that defendants' reasons for termination were pretextual. *Id.* at 176.

85. TX2–407 (Hayward).

86. TX1–167 (Decker).

87. *Id.*

88. *Id.*

89. TX1–170 (Decker).

90. TX1–165.

91. PX–3(a)–3(k) "State of Delaware Personnel Action Request Form".

92. TX2–404 (Hayward).

93. PX–19 "State of Delaware Rules for A Merit System of Personnel Administration."

94. TX2–412 (Hayward).

95. TX1–107 (Biddle).

In the case at bar, Hayward's failure to transfer Gelof, his failure to inquire about other open positions or the extent of his own authority and his failure to execute the personnel documents, all indicate that his reasons for permanently terminating Helen Gelof from state service were pretextual.

## III. DAMAGES

■ A victim of age discrimination is entitled to be made whole, including reinstatement and back pay with benefits. *Maxfield v. Sinclair International Corp.*, 766 F.2d at 788. And this Court is vested with jurisdiction to grant "such legal or equitable relief as may be appropriate to effectuate the purposes of [the ADEA], including, without limitation, judgments compelling employment, reinstatement or promotion, or enforcing the liability for amounts deemed to be unpaid minimum wages or unpaid overtime compensation." 29 U.S.C. § 626(b) (1976).

Plaintiff prays for four types of relief: (1) reinstatement; (2) back wages with benefits; (3) prejudgment interest; and (4) additional damages to reflect the increased taxes plaintiff must pay because of a lump sum award. All four measures are granted.

### A. Reinstatement.

Plaintiff foresees no problems created by reinstatement.[96] Nor do defendants contest this remedy.[97] This Court, therefore, will order defendant, the State of Delaware, to reinstate plaintiff in a job commensurate with her former position in terms of salary and skill. The position must be protected by the merit system. *See Goldstein v. Manhattan Industries*, 758 F.2d 1435 (11th Cir.1985), *reh'g.den. en banc*, 765 F.2d 154 (11th Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 525, 88

L.Ed.2d 457 (1985). (Reinstatement is the preferred remedy under the ADEA.).

### B. Backpay.

Unlike in Title VII cases, backpay under the ADEA is not discretionary, since it incorporates the provisions of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b) (1982), making backpay a mandatory element of damages. 29 U.S.C. § 626(b); *Maxfield v. Sinclair International Corp.*, 766 F.2d at 795. Plaintiff Gelof is entitled to backpay from the date of her termination until the date of reinstatement.

### 1. The Measure of Backpay

■ Prevailing parties under the ADEA are entitled to backpay in the amounts they would have earned but for the discrimination, less wages actually earned from other employment that could not have been simultaneously performed with the jobs to which they aspired. Plaintiff is also entitled to any increments in pay for the period after which she was terminated. *Koyen v. Consolidated Edison Co.*, 560 F.Supp. 1161, 1164 n. 14 (S.D.N.Y.1973).

At the date of termination, Gelof's salary was $36,291.00 per year.[98] The State legislature has since mandated salary increases of 7% on July 1, 1982; 5.5% on July 1, 1984; 4.3% on January 1, 1985; and 5.5% on July 1, 1985.[99] Subtracted from Gelof's salary, plus her post-termination salary increases, would be the $15,000 per year she earned as a real estate broker for a family business subsequent to her termination.[100]

The Court rules that plaintiff is entitled to her salary, plus yearly pay increases, from the date of termination until the day of judgment, less wages actually earned from other employment.

---

**96.** Plaintiff's Opening Post-Trial Brief at 26.

**97.** Defendants' Answering Post-Trial Brief at 11.

**98.** Stip. ¶ 13, p. 7.

**99.** *Id.*

**100.** Stip. ¶ 29, p. 14. Adjusted for pay raises, plaintiff's salary for the relevant period would be: $34,431.19 for 1982 (11 months); $37,561.19 in 1983; $38,594.80 in 1984; $39,656.16 in 1985, and $36,352.16 in 1986 (11 months).

### 2. Mitigation of Damages

■ Defendants proffer that plaintiff failed to mitigate damages. Plaintiff has breached her duty to mitigate if she has failed to exercise reasonable diligence to reduce her damages and if there is a reasonable likelihood she would have found comparable work had she exercised reasonable diligence. *Wehr v. Burroughs*, 619 F.2d 276, 278 n. 3 (3d Cir.1980).

The duty to mitigate damages "has ancient origins, and operates to prevent claimants from recovering for damages which they would have avoided through reasonable diligence." *Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614, 624 (6th Cir.1983), *cert. denied*, 466 U.S. 950, 104 S.Ct. 2151, 80 L.Ed.2d 537 (1984). Once a claimant establishes a prima facie case and presents evidence on the issue of damages, the burden of producing sufficient evidence to establish the amount of interim earnings or lack of diligence shifts to the defendant. *See, e.g., NLRB v. Reynolds*, 399 F.2d 668, 669 (6th Cir.1986).

■ The defendant may satisfy his burden only if he establishes that: (1) there were substantially equivalent positions which were available; and (2) the claimant failed to use reasonable care and diligence in seeking such positions. *Rasimas v. Michigan Dept. of Mental Health*, 714 F.2d 614 (6th Cir.1983); *Sias v. City Demonstration Agency*, 588 F.2d 692, 696 (9th Cir.1978).

Defendants failed to satisfy their burden of establishing that there were substantially equivalent position available to plaintiff. No merit system position of $30,000 or more (itself a 20% reduction from Gelof's previous salary) was ever offered Gelof by any state agency.[101]

■ Plaintiff did her best to mitigate damages. A claimant is only required to make reasonable efforts to mitigate damages, and is not held to the highest standards of diligence. The claimant's burden is not onerous, and does not require him to be successful in mitigation. *U.S. v. Lee Way Motor Freight*, 625 F.2d 918, 937 (10th Cir.1979).

■ Plaintiff undertook a concerted effort to find employment subsequent to her termination at DDO. Defendant sought six to twelve positions per year in each year since 1982 in the private sector.[102] In state government, plaintiff applied for 36 positions subsequent to 1982.[103]

The Court holds that plaintiff will not be penalized for failing to mitigate damages.

### 3. Lost Benefits; Pension, Health Insurance and Unemployment Insurance

Backpay awards reflect total earnings. B. Schlei and P. Grossman, *Employment Discrimination Law*, ch. 38, p. 1440 (2d ed. 1983). Fringe benefits, including medical insurance premiums or medical expenses incurred, pension and retirement benefits have been included in many backpay awards. *Id.* at 1441; *Kewin v. Board of Educ. of Melvindale Schools*, 8 F.E.P. 125 (Mich.Cir.Ct.1974), *aff'd.*, 65 Mich.App. 472, 237 N.W.2d 514 (1975) (premiums); *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1021 (1st Cir. 1979) (pension benefits awarded under ADEA); *Bishop v. Jelleff Assocs.*, 398 F.Supp. 579 (D.D.C.1974) (age discrimination case); *see also Danner v. Phillips Petroleum*, 447 F.2d 159 (5th Cir.) *rehearing and rehearing en banc denied*, 450 F.2d 881 (5th Cir.1971).

Defendants do not contest the figures arrived at by plaintiff's economic expert concerning the amount of lost pension benefits and health insurance premiums.[104]

---

101. TX1–134 (Biddle).

102. Stip. ¶ 23, p. 14.

103. TX1–209 (Gelof).

104. PX–8–b "Assessment of Economic Loss in the Matter of Helen Gelof v. State of Delaware."

The expert claims Gelof lost $50,909 in pension benefits, and health benefits of $3,243.

Defendants argue that an order of reinstatement effective February 1, 1982 and back pay from that date will provide her with eligibility and service credit in the State Employees Pension Plan, so an additional monetary award

The Court will award plaintiff lost pension, health insurance and unemployment insurance.

### 4. Set-offs

██ Finally, defendants ask that unemployment compensation should be set-off against the award of damages. Plaintiff counters that the "collateral source" rule should apply so that unemployment benefits paid by the state are not deducted from the judgment. Defendant-employers must assume the burdens of production and persuasion on the issue of set-offs. *Rodriguez v. Taylor*, 569 F.2d 1231, 1243 (3d Cir.1977), *cert. denied*, 436 U.S. 913, 98 S.Ct. 2254, 56 L.Ed.2d 414 (1978).

Ordinarily, the rule in this Circuit is that when the employer is the State, and not a private company, where the State paid the unemployment benefits from public tax moneys, the collateral source rule is not applied. *Dillon v. Coles*, 746 F.2d 998, 1007 (3d Cir.1984) (distinguishing *Craig v. Y & Y Snacks, Inc.*, 721 F.2d 77 (3d Cir. 1983) which involved a private employer). *See also McDowell v. Avtex Fibers, Inc.*, 740 F.2d 214 (3d Cir.1984), *vacated and remanded on other grounds*, 469 U.S. 1202, 105 S.Ct. 1159, 84 L.Ed.2d 312 (1985) (the collateral source rule applies only to private employers). But, in *Dillon*, there was a state statute that provides for recoupment of unemployment benefits by the state when backpay has been awarded. The Court reasoned that it would be wasteful of public funds to require the state to bring a separate suit to recoup the monies. *Dillon, supra,* at 1007. Here, defendants have not suggested that the State could recoup such payments under a Delaware statute. *See Maxfield*, 766 F.2d at 794.

The Court holds that there will be no set-off for unemployment compensation.

### C. Prejudgment Interest.

The Court will also award plaintiff prejudgment interest. The ADEA broadly au-

thorizes courts "to grant such legal or equitable relief as may be appropriate to effectuate the purposes" of the Act. 29 U.S.C. § 626(b). Prejudgment interest is intended to compensate "the loss of use of this money during the period payments [are] withheld from [ADEA plaintiffs]." *Kelly v. American Standard*, 640 F.2d 974, 983 (9th Cir.1981), *quoted with approval in Criswell v. Western Airlines, Inc.*, 709 F.2d 544, 557 (1983), *aff'd., Western Air Lines, Inc. v. Criswell*, 472 U.S. 400, 105 S.Ct. 2743, 86 L.Ed.2d 321 (1985). Any other rule would "dilute the purpose of ending discrimination." *McDowell v. Autex Fibers*, 740 F.2d at 217.

██ The only time prejudgment interest is not awarded is when liquidated damages are granted. *Blim v. Eastern Elec. Co., Inc.*, 731 F.2d 1473, 1479 (10th Cir. 1984). *Cf. Criswell v. Western Airlines, Inc.*, 709 F.2d 544 (9th Cir.1983) (allowing *both* liquidated damages and prejudgment interest). Liquidated damages are available under the ADEA, however, only when there is a wilful violation. 29 U.S.C. § 626(b). No wilful violation of the ADEA was alleged in the case at bar.

The rate of interest allowed on judgments in Delaware is the same as the "legal rate of interest" defined by Delaware law. *Devex Corp. v. General Motors Corp.*, 569 F.Supp. 1354, 1366 (D.Del.1983), *aff'd.*, 749 F.2d 1020 (3d Cir.1984), *cert. denied*, ── U.S. ──, 106 S.Ct. 68, 88 L.Ed.2d 55 (1985). The Delaware Code provides that "the legal rate of interest shall be 5% over the Federal Reserve discount rate including any surcharge as of the time from which interest is due...." 6 *Del.C.* 2301 (1984).

██ Interest begins to run from the date of termination—January 31, 1982. At this date, the federal discount rate was 12%. *Federal Reserve Bulletin*, January

---

would be duplicative. But Gelof contends that even if reinstated, she will be economically penalized because it will take longer for her pension to vest. *See* note 33, *supra.* Defendants

offer no authority for their assertion and have not met the bur⸍ ` that is upon them. *See* discussion in Section Four, *infra.*

31, 1982. This Court will apply a rate of interest of 17% from the date of termination to the date of judgment in this action. Post-judgment interest will run at the same rate from the date judgment is entered until the date the judgment is paid by the State of Delaware. *See Devex, supra,* at 1365–1368.

### D. Additional Award For Tax Consequences.

Plaintiff's economic expert submitted that because plaintiff will receive a lump sum award, she will be taxed at a higher rate than if she earned the same money over her normal worklife.[105] As a consequence, plaintiff argues that she should be additionally compensated for this tax loss. Defendants term this a "novel suggestion."[106] Actually, the matter has received substantial attention.

Ordinarily, backpay is taxable to the plaintiff and subject to income tax and social security withholding. *Freeman v. Blake Co.,* 84 F.Supp. 700, 704 (D.Mass 1949); Rev.Rul. 55–203, 1955–1 C.B. 114. Backpay will be paid in a single year, reported in that year and taxed at the rates then in effect. *See Driscoll v. Exxon Corp.,* 366 F.Supp. 992 (S.D.N.Y.1973); Rev.Rul. 78–336, 1978–2 C.B. 255.

One court has ruled, however, that additional damages should not be awarded due to increased tax liability that accompanies the lump sum award. *Blim v. Western Elec. Co., Inc.,* 731 F.2d 1473, 1480 (10th Cir.1984), *cert. denied,* 469 U.S. 874, 105 S.Ct. 233, 83 L.Ed.2d 161 (1984). But the reasoning of that decision was that a rewarded plaintiff could use the averaging provisions of the Tax Code that will eliminate nearly all of any penalty that would otherwise result from receipt of a lump sum payment. *See* I.R.C. §§ 1301–05.

■ This Court will not adopt the reasoning in *Blim,* because plaintiff's economic expert has presented evidence on the

record that plaintiff will suffer additional tax consequences as a result of the lump sum damage award, even assuming plaintiff avails herself of the income averaging provisions of the Internal Revenue Code. Defendants do not challenge the figures provided by the economic expert.

The 1986 Tax Reform Act, P.L. 99–514 (1986), however, repealed the income averaging provisions of the old Revenue Code. I.R.C. §§ 1301–1305 *repealed by* 1986 Tax Reform Act § 141. Plaintiff may suffer the consequences of additional taxes if the judgment in this case is not paid until 1987, when the new law will be in effect.

The Court holds that the plaintiff is entitled to additional damages of $85,000, as calculated by plaintiff's economic expert, to offset the added amount plaintiff will have to pay on her 1986 federal income tax returns.

### E. Damages Against the State.

In *Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974), the Supreme Court held that the Eleventh Amendment barred a private suit "seeking to impose a liability which must be paid from public funds in the state treasury." Since then, however, the Court found that the Eleventh Amendment and the principle of state sovereignty "are necessarily limited by the enforcement provisions of § 5 of the Fourteenth Amendment." *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). Courts that have decided the question left open by *EEOC v. Wyoming,* 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983), have found that Congress enacted the ADEA pursuant to its powers under § 5 of the Fourteenth Amendment. Congress, therefore, in passing the ADEA, abrogated the states' Eleventh Amendment immunity. *Ramirez v. Puerto Rico Fire Service,* 715 F.2d 694, 697–698 (1st Cir.1983).

---

**105.** PX–8b, p. 8 "Assessment of Economic Loss in the Matter of Helen Gelof v. State of Delaware." The amount of the tax penalty is $85,-031.00.

**106.** Defendants' Answering Post-Trial Brief at 11.

The legislative history of the ADEA reveals that Congress' purpose in extending ADEA coverage was "to shield public employees from the invidious effects of age-based discrimination." *Id.* at 699. The 1974 amendment, the ADEA itself, "is aimed at irrational, unjustified employment decisions based upon assumptions about the relationship between age and ability which classify older workers as incapable of effective job performance." *EEOC v. Elrod,* 674 F.2d 601, 605 (7th Cir.1982). The proscription of this sovereign conduct falls within the category of "appropriate legislation" under section five of the Fourteenth Amendment. 715 F.2d at 699 (and cases cited therein).

Courts have held that "the ADEA's express authorization for the maintenance of suits against state employers comprises adequate evidence to demonstrate the congressional will that Eleventh Amendment immunity be abrogated." 715 F.2d at 701.

Judgment for back pay and other damages is entered against the State of Delaware, Delaware Development Office. Defendant, State of Delaware, shall pay to plaintiff: (a) $114,315.67 for back pay (this figure includes yearly pay increases minus the amount plaintiff earned from other sources); (b) $50,909.00 in back pension benefits; (c) $3,243.00 in back health benefits; (d) prejudgment interest in the amount of $71,702.98 (which represents interest through December 1, 1986); (e) an award to compensate for any additional tax losses suffered by plaintiff because of a lump sum payment in the amount of $85,031.00; (f) postjudgment interest from the date of entry of this Judgment at the rate of 17% compounded daily; and (g) all costs. This total damage award amounts to $325,201.65.

This Opinion constitutes the Court's Findings of Fact and Conclusions of Law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure.

An Order will enter in conformity with this Opinion.

Judgment for plaintiff.