Robert V. KROUSE, Plaintiff,

v.

AMERICAN STERILIZER COMPANY, Liberty Mutual Insurance Company, Michael J. Coughlin, Scott G. Lightner, John T. Hardin, Nanette S. Stafford, Jason M. Nuara, Defendants.

Robert V. KROUSE, Plaintiff,

v.

AMERICAN STERILIZER COMPANY, Liberty Mutual Insurance Company, Defendants.

Nos. CIV. A. 94–309–ERIE, CIV. A. 95–55–ERIE.

United States District Court, W.D. Pennsylvania.

Sept. 30, 1996.

Wayne G. Johnson, Gifford, Lay & Johnson, Erie, PA, for Plaintiff.

Douglas G. Smith, Jackson, Lewis, Schnitzler & Krupman, Pittsburgh, Pa, Stephen X. Munger, Lisa A. Schreter, Laura Diane Rolnick, Jackson, Lewis, Schnitzler & Krupman, Atlanta, GA, John D. Petruso, Meadville, PA, for Defendants.

## MEMORANDUM OPINION

McLAUGHLIN, District Judge.

Plaintiff, Robert V. Krouse ("Krouse"), brings these consolidated actions against Defendants American Sterilizer Company, Mi-

896

chael J. Coughlin, Scott G. Lightner, John T. Hardin (collectively referred to as the "AMSCO Defendants"), and Liberty Mutual Insurance Company, Nanette S. Stafford, and Jason M. Nuara (collectively referred to as the "Liberty Mutual Defendants"), alleging violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* ("ADA") and the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* ("ADEA").[1] This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

Presently pending before the Court are several motions, including motions for dismissal and/or for summary judgment by the Defendants, a motion on behalf of certain Defendants to strike Plaintiff's affidavit, and motions by the Plaintiff to reopen discovery and for leave to file a supplementary brief in opposition to summary judgment. For the reasons stated below, we will grant summary judgment in favor of Defendants, grant the motion to strike Plaintiff's affidavit, and deny Plaintiff's motion to reopen discovery and file supplementary briefs. We will deny all remaining motions as moot.

## I. BACKGROUND

### A. The Parties

American Sterilizer Company ("AMSCO") is a Pennsylvania corporation engaged in the design, manufacturing, sale and servicing of hospital equipment, with its principal place of business located in Pittsburgh, Pennsylvania and a production facility located in Erie, Pennsylvania. The Erie production facility engages in the manufacture of sterilizers.

Michael J. Coughlin ("Coughlin") is AMSCO's Manager of Factory/Labor Relations at the Erie production facility. He directs the movement of manpower within the plant and is involved with job postings and hirings,

transfers, and union grievances with the plant.

G. Scott Lightner ("Lightner")[2] is AMSCO's Production Control Manager. In this capacity he is responsible for supervising all aspects of production and ensuring that goods are completed in a timely manner according to customer requirements. Additionally, Lightner is responsible for all welding department operations and bears the title of Welding Department Manager.

John T. Hardin ("Hardin") is currently employed with AMSCO in the capacity of Director, Industrial Relations/Health and Safety Management.

Liberty Mutual Insurance Company ("Liberty Mutual") is AMSCO's workmen's compensation carrier. Nanette S. Stafford ("Stafford") is a registered nurse employed with Liberty Mutual. Jason M. Nuara ("Nuara") is a former claims adjuster for Liberty Mutual.

### B. Plaintiff's Employment History

Krouse began employment with AMSCO on July 29, 1974 as a member of the bargaining unit represented by United Auto Worker's ("UAW") Local 832. Krouse held various jobs at AMSCO and in 1989 was awarded a position as a channel welder. These employees are responsible for welding channels to sterilizer shells in accordance with industry standards and specifications.

On January 14, 1991, Krouse suffered a work-related injury to his back. Following this injury, Krouse's advising health care professionals placed certain medical restrictions on the type of activity he could perform. From January 15, 1991 through May 20, 1994, AMSCO provided work assignments for Krouse that complied with his medical restrictions. During this time, Krouse had periods of total and partial disability.

---

1. Plaintiff filed Civil Action No. 94–309 Erie ("Krouse II") on November 10, 1994 against all of the above-named Defendants alleging violations of the ADA and ADEA. On March 6, 1995, Krouse filed an additional complaint at Civil Action 95–55 Erie ("Krouse III") against AMSCO and Liberty Mutual only. The Krouse III Complaint raised additional ADA and ADEA discrimination claims. These cases were consolidated at

Civil Action 94–309 Erie by an order of this Court dated June 30, 1995. An earlier civil action instituted by Krouse on October 21, 1993 at Civil Action 93–313 Erie ("Krouse I") was dismissed with prejudice on August 8, 1995.

2. Lightner is mistakenly named in the case caption as "Scott G. Lightner."

From April 12, 1993 to June 21, 1993, Krouse was assigned to the Transitional Work Group ("TWG"), which provides light-duty work for employees who have suffered temporary injuries or illness and need time and/or a work hardening program before they can return to their former positions. TWG is only a temporary assignment; it is therefore not available to permanently disabled employees as an alternative to a permanent work assignment. While Krouse was assigned to TWG, AMSCO implemented requested modifications to the channel welder position in anticipation of his return. At the time of his assignment to TWG, neither Krouse nor any of his treating doctors claimed that he suffered a permanent disability.

From June 21, 1993 to April 1, 1994, and again from April 20 to May 20, 1994, Krouse performed his previous channel welder position as modified by AMSCO. Prior to his return in June, 1993, Krouse's medical restrictions had been modified and reduced by his doctor, who indicated that Krouse was able to perform the essential functions of the modified channel welder job with the accommodations implemented by AMSCO.

The essential job functions of a channel welder include actual channel welding, loading and changing the spools that hold the welding wire, fitting and tacking the channels to the shells, loading and unloading the racks, cleaning the channels and performing operator inspections. AMSCO states that these essential functions must be performed according to the Company's expected levels of performance and the employee must be capable of regular and predictable job attendance. AMSCO further states that additional job requirements are established in the performance and time standards set by AMSCO's industrial engineers for the completion of various work projects. Employees' performance percentages are calculated on a weekly basis by comparing the standard hours established by the Company for completion of each project with the actual direct hours worked by the employee on the project. AMSCO also records "Blue Labor," which is a record of the number of hours each week not counted toward direct labor or used in calculation of performance percentages. This includes down time on a machine or time when an employee is otherwise not able to work on production, such as time taken to receive medical treatment. Fully trained channel welders are expected to pursue the applicable performance percentage standards.

AMSCO claims that Krouse did not adequately perform the essential job functions of his modified channel welder position. Krouse's performance percentages from January 1 to May 20, 1994 averaged between sixteen (16) and thirty (30) percent of the expected standard, whereas the other fully trained channel welders performed at or above fifty percent of the expected performance standard.

On or about March 23 and 31, 1994, Krouse's direct supervisor, Charles Spencer, counseled him about his level of performance. Krouse responded during the March 31 conference that, since he was not living up to Spencer's expectations, he was going to visit First Aid and then go home. Dr. Young, Krouse's chiropractor and primary health care provider, excused Krouse from work the next day on the ground that he was totally disabled.

On April 20, 1994 Krouse received a doctor's release to return to work. That same day, Coughlin, Lightner, and Krouse reviewed the medical restrictions outlined in an evaluation completed by Dr. Young on April 15, 1994. Lightner and Coughlin were of the opinion that Krouse's job responsibilities fell well within the medical restrictions placed on him by Dr. Young. Krouse himself admitted that no further accommodations were necessary to allow him to perform the essential job functions of the channel welder position. Krouse also admitted that he was working to the highest percentage possible. Lightner and Hardin also met with Krouse at some point on April 20 and advised him that his current 20 to 30% level of efficiency was unacceptable. Krouse responded that AMSCO should put someone else into his work station to help him.

AMSCO also claims that Krouse was frequently absent from work and that these absences created problems in the Erie plant.

From January 1994 to April 14, 1994, Krouse left the Erie plant abruptly and without prior notice more than twenty times to visit Dr. Young. During the eleven-month period in which he held the modified channel welder position, Krouse left the facility over fifty times for unscheduled visits with Dr. Young. During their April 20, 1994 meeting, Hardin and Lightner discussed with Krouse the amount of time that Krouse was spending on doctor visits and the fact that these unscheduled absences resulted in substantial production delays. Hardin and Lightner observed that the Company was often left without a welder to perform those critical production functions and that this, in turn, resulted in production backlogs in other departments. Their position was that Krouse should schedule appointments that could be managed. Krouse responded that he could not guarantee the frequency or the time of his doctor appointments because he had to be treated as he felt the need. However, he indicated his willingness to negotiate a job that better suited his situation. Hardin advised Krouse that, under the UAW/AMSCO agreement, the Company did not have the right to unilaterally create a job for him, as all new positions had to be open for bidding. Accordingly, Krouse was advised to return to work with the knowledge that the issues of his absences and efficiency were being addressed.

On May 3, 1994, the welding department completed another review of Krouse's efficiency and overall performance and found that it remained between twenty-five and thirty percent. Based upon this performance rate, coupled with Krouse's admission that he was working to the highest percentage possible, Lightner concluded that Krouse could not perform the essential functions of the channel welder position. He therefore recommended that Krouse be removed from the channel welder position as soon as possible.

During a meeting on May 20, 1994, Coughlin informed Krouse that his low efficiencies were causing an increase in costs to the Company. AMSCO had provided Krouse all of the accommodations and modifications requested by his physician and there were no other vacant positions available at that time which Krouse could perform. Krouse therefore was not reassigned to TWG. Instead, Coughlin advised him that, as of May 23, 1994, he would be placed on worker's compensation leave and provided with the full amount of benefits available under the Pennsylvania Workmen's Compensation Act.

From May 23, 1994 to February 21, 1995, Krouse remained on worker's compensation leave. On February 21, 1995, Krouse was placed in a modified Dismantle and Tag position for which he had bid. This job required him to perform duties which were consistent with his medical restrictions. After taking intermittent periods of worker's compensation leave, Krouse ultimately returned to leave status on April 21, 1995 and has not since returned to active status. Krouse admits that, as of April 21, 1995, he became totally disabled.

As a result of his back injury, Krouse sought a disability pension and filed a claim with the UAW/AMSCO Pension Board of Administration, alleging total and permanent disability. The claim was reviewed on October 19, 1994 by four members of the Pension Board comprised of three union representatives and one AMSCO representative. The Board reviewed various documents presented by Krouse, including the denial of a previous claim for Social Security disability benefits,[3] doctors' reports, correspondence from Krouse, and a work tolerance evaluation performed on September 19–20, 1994.[4] It determined that Krouse was not eligible for disability benefits at that time and denied his claim. Krouse did not appeal the denial.

**3.** Krouse applied for Social security disability benefits in June or July of 1994.

**4.** Krouse underwent a functional capacity examination by Clinical Therapeutics, Inc. on September 19–20, 1994. The purpose of the evaluation was to determine: (1) whether Krouse was totally disabled; and (2) if not, whether his condition had changed and he could now perform all of the

essential functions of the channel welding position including satisfying AMSCO's performance standards. While CPI determined that Krouse could physically perform the job functions of the modified channel welding position, CPI concluded that it was doubtful that Krouse could improve his performance level.

Following his placement on worker's compensation leave, Krouse filed a number of union grievances and EEOC charges relevant to his present claims. Thereafter, he filed these consolidated actions, asserting causes of action under ADA and ADEA.[5] The AMSCO and Liberty Mutual Defendants have separately filed motions for summary judgment. We discuss those motions first because of their potentially dispositive nature.

## II. DISCUSSION

### A. Defendants' Motions for Summary Judgment

#### 1. Standard of Review

It is well settled that summary judgment is appropriate only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). On a motion for summary judgment, all facts must be construed in the light most favorable to the non-movant. *International Raw Materials, Ltd. v. Stauffer Chemical Co.*, 898 F.2d 946, 949 (3d Cir.1990).

Once the moving party has satisfied its burden of identifying evidence which demonstrates the absence of a genuine issue of material fact, the non-moving party must demonstrate by affidavits or other appropriate materials the existence of specific materi-al facts which give rise to a genuine issue. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Equimark Commercial Finance Co. v. C.I.T. Financial Services Corp.*, 812 F.2d 141, 144 (3d Cir.1987). In doing so, the non-movant may not rest upon bear assertions, conclusory allegations or mere suspicion, but must set forth specific facts showing that there is a genuine issue for trial. Fed.R.Civ.P. 56(e); *Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981). An issue of material fact is considered "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). *See also Matsushita Electric Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986).

#### 2. Plaintiff's ADA Claims

Krouse has asserted several violations of the Americans with Disabilities Act, 42 U.S.C. §§ 12101 *et seq.* Specifically, he claims that the AMSCO Defendants unlawfully retaliated against him for filing charges of disability discrimination with the EEOC by: (1) placing him on worker's compensation leave; (2) failing to offer him a disability pension; and (3) refusing to create a special position for him as a long service employee under Section K of the applicable collective bargaining agreement.[6] Krouse also asserts that the AMSCO and Liberty Mutual Defen-

---

**5.** In his brief in opposition to Defendants' motions to dismiss, Krouse represented that he is alleging that Defendants' acts constituted willful, unlawful, intentional discrimination in violation of the Civil Rights Act of 1991, 42 U.S.C. § 1981. We presume that Krouse inadvertently referenced § 1981 when he meant § 1981a. Section 1981a allows for the recovery of compensatory and punitive damages in cases involving intentional employment discrimination under Title VII or ADA, but it does not confer any independent cause of action. *See Ferry v. Roosevelt Bank*, 883 F.Supp. 435, 442 (E.D.Mo.1995); *Thomas v. Frank*, 791 F.Supp. 470, 476 (D.N.J.1992). Accordingly, the Court will not address the § 1981a claim in this opinion.

To the extent Krouse would attempt to assert a cause of action under § 1981, we note that that statute has been interpreted as conferring causes of action based only on racial discrimination.

*See Diulus v. Churchill Valley Country Club*, 601 F.Supp. 677, 680 (W.D.Pa.1985), and cases cited therein. As Krouse has not advanced a claim of racial discrimination and has produced no evidence in support of such a claim, he has no viable cause of action under § 1981.

**6.** Krouse is a member of the bargaining unit represented by the United Autoworkers, Local 832 ("UAW"). The UAW and AMSCO negotiated a collective bargaining agreement which was in effect from June 23, 1992 through June 22, 1995. Section K of the agreement provides that when older, long service employees are unable to perform their usual work the union and AMSCO may, by mutual agreement, make an effort to provide them with some sort of employment which they are able to do.

dants conspired to harass him and retaliated against him by abusing the Workmen's Compensation Act for the purpose of circumventing ADA's requirements and preventing him from working. These claims will be addressed seriatim.

### a. AMSCO's Decision to Place Plaintiff on Workmen's Compensation Leave

■ We first consider Krouse's allegation that he was removed from his position as channel welder and placed on worker's compensation leave in retaliation for filing charges of disability-related discrimination.

In order to come within the protection of the ADA, a plaintiff must establish that he or she is a "qualified individual with a disability." 42 U.S.C. § 12112(a). This term is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The AMSCO Defendants argue that Krouse cannot satisfy this definition. They claim that Krouse is judicially estopped to assert status as a "qualified individual with a disability" by virtue of his previous assertions of total disability in connection with applications for Social Security disability insurance benefits, disability pension benefits, and disability credit insurance benefits.

■ The Third Circuit Court of Appeals recently explained the concept of judicial estoppel in *Ryan Operations G.P. v. Santiam–Midwest Lumber Co.,* 81 F.3d 355 (3d Cir. 1996):

Judicial estoppel, sometimes called the "doctrine against the assertion of inconsistent positions," is a judge-made doctrine that seeks to prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding. It is not intended to eliminate all inconsistencies, however slight or inadvertent; rather, it is designed to prevent litigants from "playing 'fast and loose with the courts.'" ... "The basic principle ... is that absent any good explanation, a party should not be allowed to gain an advantage by litigation on one theory, and then seek an incon-

sistent advantage by pursuing an incompatible theory."

81 F.3d at 358 (internal citations omitted). Under *Ryan,* "any application of the doctrine must rest upon a finding that the party against whom estoppel is sought asserted a position inconsistent with one she previously asserted in a judicial proceeding." *Id.* at 361. Such a determination entails a two-part inquiry: (1) is the party's present position inconsistent with a position he or she asserted in a precedent proceeding; and (2) if so, did the party assert either or both of the inconsistent positions in bad faith—i.e. "with an intent to play fast and loose with the court." *Id.* Both prongs must be satisfied in order for judicial estoppel to apply.

The AMSCO Defendants point out that, in June or July of 1994, Krouse represented to the Social Security Administration under oath that he was completely and totally disabled. After his claim was denied by the Administration, Krouse appealed the decision and even wrote to his United States Senator, urging that the case be reopened. Krouse also applied for a disability pension under the AMSCO/UAW Pension Plan, alleging total and permanent disability for purposes of the plan. Krouse's chiropractor and primary health care professional, Dr. Daniel L. Young, has certified that Krouse was permanently disabled as of May 20, 1994. Additionally, Krouse has been receiving benefits under a disability credit insurance policy based on his representations and those of his doctor that he is totally disabled. The AMSCO Defendants argue that Krouse cannot represent on one hand that he is totally and permanently disabled and at the same time argue that he is a qualified individual under the ADA.

The Third Circuit recently applied the doctrine of judicial estoppel in a context similar to the case at bar in *McNemar v. The Disney Store, Inc.,* 91 F.3d 610 (3d Cir.1996). That case involved a claim by an employee with HIV that he was discharged from his employment at The Disney Store, Inc. in violation of the ADA. The district court determined that McNemar was judicially estopped from claiming status as a "qualified individual with a disability" under the Act based on

his prior sworn statements, made in his application for Social Security Disability Insurance benefits and New Jersey state disability benefits, that he was unable to work because of a disabling physical condition. On appeal, the Third Circuit affirmed, finding that the district court had not abused its discretion in so ruling.

In its decision, the *McNemar* Court specifically approved the district court's application of judicial estoppel under the two-part inquiry articulated in *Ryan Operations*. It first noted that McNemar had asserted inconsistent positions regarding his ability to work:

> Before the Social Security Administration he and his physicians have certified under penalty of perjury that he was totally and permanently disabled. He made similar representations when he applied for New Jersey state disability benefits. And when applying for an exemption from making payments on his student loans, he represented to the state of Pennsylvania that he was unable to work and earn money. Thus, McNemar has represented to one federal agency and to the agencies of two different states that he was totally disabled and unable to work—while now, in claiming relief under the American Disabilities Act, he states that he is "a qualified person with a disability who, with or without reasonable accommodation, can perform the essential functions of a job" as contemplated by 42 U.S.C. §§ 12111(8), 12112(a).

91 F.3d at 618. The court also found that the bad faith element was satisfied under these circumstances. It noted with approval several "well reasoned decisions [that] have judicially estopped plaintiffs in situations similar to this one from 'speak[ing] out of both sides of [their] mouth with equal vigor and credibility before [the] court.'" *Id.* (quoting *Reigel v. Kaiser Found. Health Plan of North Carolina,* 859 F.Supp. 963, 970 (E.D.N.C.1994) and citing *August v. Offices Unlimited,* 981 F.2d 576 (1st Cir.1992); *Garcia–Paz v. Swift Textiles, Inc.,* 873 F.Supp. 547 (D.Kan.1995); *Kennedy v. Applause, Inc.,* 1994 WL 740765 at *3–4 (C.D.Cal. Dec.6, 1994)). Observing that "McNemar's statements on his disability benefits application were 'unconditional assertions as to his disability,'" the court reasoned that McNemar "should not now be permitted to 'qualify those statements where the application itself is unequivocal.'" *Id.* (quoting *Smith v. Midland Brake, Inc.,* 911 F.Supp. 1351, 1361 (D.Kan.1995)).

We see no persuasive reason why the logic and holding of *McNemar* should not apply here. Krouse has asserted a position in these proceedings concerning his ability to perform his channel welding job which is inconsistent with the position he has previously asserted in other judicial and non-judicial contexts. In connection with his Social Security disability claim, Krouse knowingly represented under oath that he is entitled to benefits and admits that he knew entitlement was premised upon complete disability. Similarly, Krouse knowingly represented to the AMSCO/UAW pension committee and to an independent insurance carrier that he is entitled to benefits based on his disabled status. Despite having made these assertions, Krouse now argues that he is a qualified individual under the ADA because he was and is able to perform his former job with proper accommodation. By deliberately advancing such contrary positions Krouse has, in our view, evidenced an intent to "play fast and loose with the court." *Ryan,* 81 F.3d at 361, 363. We therefore conclude that Krouse is barred by the doctrine of judicial estoppel from asserting status as a "qualified individual with a disability" under the ADA. This ruling is in accordance with the majority of courts that have applied judicial estoppel in similar contexts. *See, e.g., August v. Offices Unlimited,* 981 F.2d 576 (1st Cir.1992) (plaintiff who certified on form for disability benefits that he was "totally disabled" was precluded as a matter of law from arguing that he was a "qualified handicapped person" under Massachusetts law); *Morris v. Siemens Components, Inc.,* Civ. Action No. 95–5242, 1996 WL 294074 at * 8–9 (D.N.J. May 31, 1996) (plaintiff judicially estopped from arguing that she was discharged in violation of New Jersey Law Against Discrimination when, at the time of discharge, she filed applications for short and long-term disability benefits stating that she was totally disabled and could not work); *Farrow v. Bell Atlantic–PA,* 5 A.D. Cases 793, 1996 WL

316798 at *5–6 (W.D.Pa. April 26, 1996) (employee estopped from claiming status as "qualified individual" under ADA by virtue of filing claim for Social Security disability benefits); *Lewis v. Zilog, Inc.,* 908 F.Supp. 931, 945 (N.D.Ga.1995) (employee who claimed total disability in order to receive long-term disability payments, who took medical leave on the basis she could not work, who admitted she was unwilling to work, and whose doctors certified her inability to work, was judicially estopped from claiming status as "qualified individual" under ADA); *Garcia–Paz v. Swift Textiles,* 873 F.Supp. 547 (D.Kan.1995) (plaintiff with multiple sclerosis who certified on long-term disability benefits application that she was "unable to perform material duties of work" was estopped from arguing that she was "qualified individual" under ADA); *Kennedy v. Applause, Inc.,* 1994 WL 740765 at *3–4 (C.D.Cal. Dec.6, 1994) (plaintiff with chronic fatigue syndrome who represented for purposes of obtaining disability benefits that she was completely disabled was estopped from arguing that she was qualified under ADA), *aff'd,* 90 F.3d 1477 (9th Cir.1996); *Reigel v. Kaiser Found. Health Plan of North Carolina,* 859 F.Supp. 963, 970 (E.D.N.C.1994) (plaintiff with shoulder injury who claimed for purposes of receiving disability insurance payments that she was prematurely disabled was estopped from arguing that she was qualified under ADA). *But see Smith v. Dovenmuehle Mortgage, Inc.,* 859 F.Supp. 1138, 1142 (N.D.Ill. 1994) (declining to apply judicial estoppel on the grounds that to do so would put the plaintiff in the untenable position of choosing between his right to seek disability benefits and his right to seek redress for an alleged violation of the ADA).

Krouse protests that his application for Social Security Disability benefits does not implicate judicial estoppel concerns because "[t]he Social Security Act clearly provides for total disability for individuals who can continue to work." (Pl.'s Br. in Opp. to AMSCO Defs.' Mot. for Summ. Judg. at 18.) We assume that Krouse is referring to the fact that, under the Social Security Act, certain "listed impairments" are presumptively disabling—and thereby create an entitlement to benefits—regardless of the claimant's actual physical capabilities. *See* 20 C.F.R. part 404, subpart P, Appendix I (1996). A similar argument was advanced in McNemar and rejected. In *McNemar,* the Third Circuit disagreed with the plaintiff's theory that, because AIDS is listed as a "presumptive disability" on the Social Security application forms, his representations that he was "totally and permanently disabled" did not necessarily render him unqualified to perform his previous job under the ADA. The court noted that the "presumptive disability" status of AIDS serves only to eliminate the requirement that individuals afflicted with the disease offer evidence that they are unable to perform their previous jobs. "Whatever the Social Security Administration's criteria for eligibility for disability benefits," the court stated, "the fact remains that McNemar told the U.S. Government and the states of New Jersey and Pennsylvania under penalty of perjury that he was physically unable to work, and the district court had the discretion to judicially estop him from taking a contradictory position in this proceeding." *McNemar,* at 19–20. Thus, the mere fact that certain conditions are presumptively disabling under the Social Security Act does not foreclose our application of judicial estoppel here where Krouse represented under penalty of perjury that he is completely unable to engage in substantial gainful activity.

■ Krouse also protests that he should not be estopped because AMSCO "required that [he] apply for Social Security benefits in order to obtain his pension benefits," even though no such requirement appears in the Company's pension handbook. (Pl.'s Br. in Opp. to AMSCO Defs.' Mot. for Summ. Judg. at 18–19.) Contrary to Krouse's assertion, the evidence does not support the allegation that AMSCO insisted Krouse apply for Social Security benefits. As far as the Court can tell from the present record, Krouse was first advised of the correlation between Social Security benefits and Disability Pension benefits on August 30, 1994, after Krouse had already filed his application with the Social Security Administration. (AMSCO Defs.' Ex. 21.) Moreover, AMSCO was not the final arbiter with respect to Krouse's application for a disability pension. That decision

was apparently made by a committee of the Pension Board comprised of three union representatives and only one AMSCO representative. In denying Krouse a disability pension, based in part on the Social Security Administration's denial of his disability benefits claim, the Pension Board followed its historic policy of awarding disability pension benefits only to those individuals who have actually been adjudicated disabled under the Social Security Act.

Krouse next argues that he should not be judicially estopped because he was not ultimately successful on his Social Security claim and is not receiving disability benefits. On this ground, he seeks to distinguish *Lewis v. Zilog, Inc., supra*, which involved a plaintiff who was successful in recovering disability benefits. However, in *Ryan*, the Third Circuit expressly considered "whether as a general rule a party must have benefitted from her prior position in order to be judicially estopped from subsequently asserting an inconsistent one," and "readily conclude[d] that the doctrine of judicial estoppel in this circuit contains no such requirement." 81 F.3d at 361. The critical issue is what the party contended in the underlying proceeding, rather than what the factfinder found. *Id.* (quoting *Lewandowski v. National Railroad Passenger Corp. (Amtrak)*, 882 F.2d 815 (3d Cir.1989)). Thus, Krouse's lack of success in obtaining Social Security disability benefits does not preclude our application of judicial estoppel. In any event, however, Krouse's argument overlooks the fact that he has been successful in receiving $385.00 per month to cover car payments and $86.00 per month to cover refrigerator payments pursuant to a disability credit insurance policy, based on his representations of disability.

■■ Finally, Krouse contends that Dr. Young did not certify him as totally and permanently disabled but, rather, certified him as capable of performing light duty work. Krouse maintains that it was only because of AMSCO's failure to provide him light duty work that Dr. Young classified him as disabled. Assuming this is true, it does

not materially advance Krouse's ADA claim. It is undisputed that, following his placement on worker's compensation leave, there was no light duty position available for Krouse to fill. That being so, AMSCO was under no obligation to create a light duty position for him where one was not otherwise available. *See Howell v. Michelin Tire Corp.*, 860 F.Supp. 1488, 1492 (M.D.Ala.1994). Moreover, Dr. Young's statement does not negate the fact that Krouse himself knowingly represented, under penalty of perjury, that he was eligible for Social Security disability insurance benefits, as well as a disability pension and disability credit insurance benefits. Krouse was aware that such eligibility depended upon his being totally and permanently disabled. Under these circumstances, Krouse is judicially estopped from now contending otherwise.

■ Putting aside our application of judicial estoppel, we conclude that Krouse's claim has another fatal flaw. Krouse admits that his ADA claim premised upon his removal from the channel welder position is in the nature of a retaliation claim. (*See* Krouse Depo., AMSCO Defs.' Ex. at pp. 55–56.) Specifically, he claims that he was removed from his job and placed on worker's compensation leave in retaliation for having filed an ADA charge of discrimination and engaging in union activities. In order to establish a prima facie case for unlawful retaliatory conduct under ADA, a plaintiff must present evidence from which a jury could reasonably conclude: (1) that he engaged in activity protected by the statute; (2) that he suffered an adverse employment action; and (3) that there was a causal connection between the protected activity and the adverse employment action. *Charlton v. Paramus Bd. of Educ.*, 25 F.3d 194, 201 (3d Cir.) (Title VII action), *cert. denied*, 513 U.S. 1022, 115 S.Ct. 590, 130 L.Ed.2d 503 (1994). Krouse has adduced no evidence that the alleged adverse employment action was taken in retaliation for his protected activity aside from the fact he was placed on worker's compensation some 19 months after filing an EEOC charge in October, 1992.[7] In fact, Krouse was re-

---

7. We also note that the only grievance filings of record indicate that they were filed after

Krouse's placement on worker's compensation.

turned to his former channel welder position in June of 1993 following the filing of his October, 1992 EEOC charge. No other EEOC charges were filed between June of 1993 and May 20, 1994, when Krouse was ultimately removed from his channel welder job. At deposition, Krouse admitted that this claim was based solely on his own opinion and belief that he was placed on worker's compensation leave in retaliation for filing the EEOC charge. (Krouse Depo., AMSCO Defs.' Ex. 2 at 57–58.) He can point to no other employee who was similarly situated yet treated more favorably on the basis of not having filed EEOC charges.[8] In sum, we find insufficient evidence in this record for a jury reasonably to conclude that Krouse was removed from his position and placed on worker's compensation leave as a result of, and in retaliation for, filing a charge of discrimination with the EEOC. Summary judgment will be entered in favor of Defendants on this claim.[9]

### b. Denial of Disability Pension Benefits

Krouse also asserts that he was denied a disability pension in October of 1994 in retaliation for having filed a charge of discrimination with the EEOC. Upon review of the arguments of counsel and the evidence of record, we conclude that this claim cannot survive summary judgment. Specifically, the Court finds that there is insufficient evidence as a matter of law to establish a causal connection between Krouse's filing of EEOC charges, or other protected activity, and his denial of a disability pension in October of 1994. The evidence before us shows that the decision to deny Krouse a disability pension was made not by AMSCO but by a bilateral committee of the Pension Board comprised of three union representatives and only one AMSCO representative.[10] We are aware of no evidence demonstrating that, but for the AMSCO representative's vote, Krouse would have received his pension. Moreover, there is no evidence whatsoever on this record to suggest that any of the decision-makers involved in the denial had knowledge of Krouse's protected activities. We therefore fail to see how any causal connection can reasonably be inferred between Krouse's filing of the October, 1992 EEOC charge and the decision to deny Krouse a pension benefit.

At his deposition, Krouse asserted as a factual basis for this claim that he should have been qualified automatically for the pension by virtue of the fact that he was placed on worker's compensation leave by AMSCO and that AMSCO "considered [him] disabled." This allegation misconstrues the evidence. (Krouse Depo., AMSCO Defs.' Ex. 2 at 65.) AMSCO states that Krouse was removed from the channel welder position in May of 1994 because AMSCO had determined he could not perform the essential functions of that particular job at an acceptable production rate. Although Dr. Young apparently felt Krouse could perform light

8. Although Krouse points to Dan Oler as a similarly situated employee who had not filed EEOC charges and was retained at his position, we think the evidence clearly reveals that Oler was not similarly situated to Krouse. Oler suffered only a temporary injury. In addition, his performance percentages during his period of recovery were on average higher than Krouse's and showed significant improvement as time progressed. During the period from January 2 to May 22, 1994, Krouse's performance percentage remained between 16–30%. Krouse admitted that he could not exceed that rate without assistance. Oler, on the other hand, performed at between 23–85% during the period from January 2 to July 3, 1994. During the last month of his recovery, he remained between 60–85%. (See AMSCO Def.'s Ex. 14.)

9. Even were we to find that Krouse satisfies his prima facie burden of demonstrating retaliation,

we note that AMSCO has proffered a legitimate explanation for Krouse's placement on worker's compensation—i.e. that Krouse could not perform to his expected level as a channel welder. For reasons discussed in connection with Krouse's ADEM claim premised on his removal from the channel welder job, infra, we would find that Krouse has not adequately rebutted this explanation for purposes of surviving summary judgment under the standards set forth in *Fuentes v. Perskie,* 32 F.3d 759, 763–64 (3d Cir. 1994).

10. While the ADA defines those "covered entit[ies]" subject to liability to include joint labor-management committees, *see* 42 U.S.C. § 12111(2), Krouse has not named the Pension Plan Committee or any union representatives as a defendant in these actions.

duty work, there is undisputed evidence that, at the time of his removal from the channel welder job, no light duty positions were available for Krouse. The undisputed facts show that AMSCO never determined that Krouse was "totally disabled;" rather, it determined that Krouse could not carry out the physical demands of the channel welder position and placed him on leave because there were no other jobs available at that time consistent with Krouse's medical limitations.

Because of Krouse's failure to establish a prima facie retaliation case, we will grant summary judgment for the AMSCO Defendants on this claim.

C. *Failure to Give Plaintiff Consideration for a Section K Position*

■■■■ Krouse also asserts an ADA retaliation claim premised upon AMSCO's refusal to create a position for him under Section K of the AMSCO/UAW collective bargaining agreement.[11] Once again, we find that this claim cannot survive summary judgment because Krouse has not established a prima facie case of retaliation.

As an initial matter, the AMSCO/UAW agreement shows that the decision to award a Section K position is not a decision made by AMSCO acting alone but, rather, is a joint decision concerning which both AMSCO and the Union have a voice. (AMSCO Def.'s Ex. 10, pp. 67–68.) Moreover, in the instant

case, Krouse's grievance concerning his denial of a Section K position (No.1994–55) was settled in favor of AMSCO because the UAW and AMSCO agreed that, in order to be qualified for Section K treatment under the terms of the collective bargaining agreement, an employee must be at least 55 years of age with at least 30 years of employment service at AMSCO. (AMSCO Def.s' Ex. 36–37.) As it is undisputed that Krouse did not meet these requirements, he was not entitled to Section K consideration under the terms of the collective bargaining agreement.[12] We cannot see how the denial of a Section K position, to which Krouse was never entitled, can be considered an adverse employment action. *See Jackson v. Lyons Falls Pulp & Paper, Inc.*, 865 F.Supp. 87, 95 (N.D.N.Y. 1994) (no adverse action based on denial of severance pay and benefits where plaintiff was not otherwise entitled to receive them; in refusing to grant them, defendant merely declined to enlarge plaintiff's rights to compensation). Because Krouse is unable to establish adverse action arising out of the denial of his application for a Section K position, this claim cannot survive summary judgment.

d. *The Functional Capacity Examination and Utilization Review*

Finally, Krouse asserts ADA claims premised upon the allegations that Liberty Mutual and AMSCO required him to undergo a func-

---

**11.** Krouse admitted at his deposition that Count I of the Complaint in Civil Action 95–55 Erie was based solely on a charge of unlawful retaliation under ADA. To the extent that Krouse asserts a "failure to accommodate" claim under this count, we conclude that such a claim cannot withstand summary judgment. An employer generally is not required by the ADA to create a special job for an employee in order to accommodate the employee's disability. *See Howell v. Michelin Tire Corp.*, 860 F.Supp. 1488 (M.D.Ala. 1994). In addition, there is no evidence whatsoever of a particular "Section K" position that Krouse would have been qualified to fill, with or without accommodation and, therefore, he has not established status as a "qualified individual with a disability." In fact, for the reasons discussed previously, we conclude that Krouse would be judicially estopped to assert status as a "qualified individual" for purposes of any Section K position.

**12.** Krouse attempts to present a factual dispute concerning the terms of Section K by arguing

that the relevant agreement language in effect at the time of his application in September of 1994 did not specifically contain the requirements of 55 years of age and 30 or more years of service. We do not perceive a genuine dispute concerning this issue. AMSCO's position appears to be, and the documentation suggests (and Krouse has not seriously rebutted) that AMSCO and the Union arrived at an agreement concerning the proper interpretation of the very language Krouse relies upon:

> employees who have grown old in the service of the company, but who are no longer physically able to perform their usual work, will be given consideration by the company and an effort will be made to provide them with some sort of employment which they are able to do. (AMSCO Defs.' Ex. 10, Sec. K, pp. 67–68; Ex. 1 to Pl.'s Br. in Opp. to AMSCO Defs.' Mot. for Summ. Judg.) It appears to us to be undisputed that AMSCO and the UAW mutually interpreted this language to require at least 55 years of age and 30 or more years of service. (AMSCO Defs.' Exs. 36–38.)

tional capacity exam and that they harassed him and retaliated against him by filing numerous petitions before the Pennsylvania Bureau of Worker's Compensation, including a September 20, 1994 utilization review petition concerning Krouse's medical treatment. Both the AMSCO and Liberty Mutual Defendants have moved for summary judgment on these claims.

Initially, we note that the ADA prohibits a "covered entity" from discriminating against qualified individuals with a disability with respect to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, or any other terms, conditions, and privileges of employment. 42 U.S.C. § 12112(a). The term "covered entity" is defined to include employers, employment agencies, labor organizations, or joint labor-management committees. § 12111(2). The term "employer" is generally defined as: "a person engaged in an industry affecting commerce who has 15 or more employees for each working day in each of 20 or more calendar weeks in the current or preceding calendar year, and agent of such person." 42 U.S.C. § 12111(5)(A). Central to our consideration of Liberty Mutual's motion is the issue whether Liberty Mutual can be considered an "employer" of Krouse, and hence subject to liability, under the ADA.

Krouse appears to assert two theories for holding Liberty Mutual liable as an "employer." First, he argues that Liberty Mutual acted as the agent of AMSCO in allegedly harassing him through misuse of the worker's compensation procedures. The Liberty Mutual Defendants contend that there is no evidence on this record establishing an agency relationship between AMSCO and Liberty Mutual which could serve as a basis for Liberty Mutual's liability under the ADA. Upon review of the record, we agree that there is insufficient evidence as a matter of law to support Krouse's agency theory. Although Liberty Mutual was and is AMSCO's worker's compensation carrier, this fact does not by itself give rise to an inference that Liberty Mutual acted at the direction of AMSCO in the handling of Krouse's worker's compensation claim. Krouse asserted at deposition that his only evidence of the alleged agency relationship is the fact that he was furnished a supplemental agreement in connection with his worker's compensation claim that had Liberty Mutual's name on it. We fail to see how this fact bears any relevance on the issue of whether Liberty Mutual acted at the direction of AMSCO in handling Krouse's claim. Krouse also now asserts in his brief in opposition to the Liberty Mutual Defendants' summary judgment motion that "[t]he functional capacity exam was not requested by any physician but ordered by AMSCO." (Pl.'s Br. at 6.) However, this assertion is unsupported by affidavit or any other evidence properly of record under Fed.R.Civ.P. 56(c).[13] Krouse's only other support for his agency theory is the allegation that Liberty Mutual was an agent of AMSCO because it "controlled Plaintiff's medical treatment." (Pl.'s Br. in Opp. to Liberty Mutual Defs.' Mot. for Summ. Judg. at 6–7.) He points to a letter from Defendant Nuara to Dr. Young, dated September 8, 1992, in which Nuara sought information concerning Krouse's chiropractic treatment, diagnosis and progress. In the letter, Nuara questioned Krouse's motivation to return to his job and requested information as to when Krouse might return to work without medical restriction. (Ex. B. to Pl.'s Br. in Opp.) Contrary to Krouse's assertions, we do not believe this letter supports a finding that Liberty Mutual "controlled" Krouse's medical treatment. As a worker's compensation carrier, Liberty could seek utilization reviews by the Pennsylvania Workmen's Compensation Board, but it could not

13. Krouse merely represents in his brief that Dr. Young would testify at trial that he (Dr. Young) was informed by an AMSCO employee that the functional capacity exam was being required by AMSCO yet ordered by Liberty Mutual. Such a statement constitutes, at best, mere hearsay evidence which cannot defeat a summary judgment motion. See In re Paoli R.R. Yard PCB Litigation, 35 F.3d 717, 770 (3d Cir.1994), cert. denied sub nom. General Elec. Co. v. Ingram, 513 U.S. 1190, 115 S.Ct. 1253, 131 L.Ed.2d 134 (1995). Moreover, it is not clear that this proffered testimony could be reduced to admissible evidence at trial because, even if Dr. Young were to testify, it is not clear that the content of the AMSCO employee's statement could properly be considered an admission by a party opponent under Fed. R.Evid. 801(d)(2)(D).

as of right make unilateral decisions regarding Krouse's treatment.[14] We conclude that the paucity of evidence here cannot support a reasonable finding that Liberty Mutual acted as the agent of AMSCO in handling Krouse's worker's compensation claim.

■ Krouse's second theory is that Liberty Mutual is liable under a line of cases holding that a party can be considered an "employer" under the ADA if it has the ability to significantly affect an individual's access to non-discriminatory employment opportunities with a third party. In support of this theory, Krouse cites *Carparts Distribution Center, Inc. v. Automotive Wholesaler's Ass'n*, 37 F.3d 12 (1st Cir.1994); *Christopher v. Stouder Mem. Hosp.*, 936 F.2d 870, 875 (6th Cir.), *cert. denied*, 502 U.S. 1013, 112 S.Ct. 658, 116 L.Ed.2d 749 (1991); *Doe on Behalf of Doe v. St. Joseph's Hosp.*, 788 F.2d 411, 422 (7th Cir.1986); and *Sibley Mem. Hosp. v. Wilson*, 488 F.2d 1338, 1341 (D.C.Cir.1973).

Assuming that this circuit would adhere to the principles set forth in these cases, we nevertheless find the cited cases factually inapposite to the case at bar. *Sibley* involved a plaintiff who was a male private duty nurse working in a private hospital for patients needing a private nurse. When a patient needed a private nurse the hospital's nursing office would communicate the request to a registry which would then match the patient with an available nurse. The plaintiff in *Sibley* complained that supervisory nurses at the defendant hospital had themselves rejected him and prevented him from reporting to the patient when the patient was female. The court ruled that Sibley could maintain a Title VII action based on these allegations, despite the fact that he had no direct employment relationship with the hospital, because the hospital retained control over Sibley's access to the job mar-

ket. 488 F.2d at 1341. *Christopher* involved a claim by a private duty scrub nurse that the defendant violated Title VII in refusing her limited privileges to work as a private scrub nurse for doctors at the hospital. The court ruled that, although the plaintiff was not a direct employee of the hospital, the hospital's control over her ability to practice as a private scrub nurse sufficiently impacted her employment opportunities to bring her within the intended scope of the statute. 936 F.2d at 874. Similarly, *St. Joseph's Hosp.* involved a Title VII plaintiff who sued a hospital as well as its board of directors, administrators, and medical staff executive committee for alleged racial discrimination in connection with her loss of staff privileges. The court followed the rationale of *Sibley* and held that plaintiff stated a Title VII claim against the defendants since she had alleged that the hospital's action in denying staff privileges interfered with her employment opportunities. 788 F.2d at 423–25.

We find *Sibley*, *Christopher*, and *St. Joseph's Hosp.* to be distinguishable in that each of those cases involved defendants who were in a position to significantly influence the plaintiffs' respective employment opportunities, either by restricting the plaintiff's access to patients, or by restricting the plaintiffs' hospital privileges. Here, by contrast, there is no evidence that Liberty Mutual has the ability to control Krouse's employment opportunities with AMSCO or with any other employer. At most, Liberty Mutual could only attempt to influence the terms of Krouse's worker's compensation coverage by filing petitions before the Workmen's Compensation Board. Even then, Liberty Mutual would not be the ultimate decision-maker with respect to Krouse's entitlements under the Workmen's Compensation Act.

14. Krouse also attaches to his brief a letter from his worker's compensation attorney which purports to outline the history of Defendants' alleged harassing treatment. (*See* Ex. A to Pl.'s Br. in Opp. to Liberty Mutual Defs.' Mot. for Summ. Judg.) However, this letter is unaccompanied by any affidavit of Krouse's attorney, nor is there any representation that would testify to these events at trial. As such, the letter constitutes hearsay evidence. Moreover, to the extent Krouse submits the letter as evidence of an agency between Liberty Mutual and AMSCO in the handling of Krouse's worker's compensation claim, we find the letter substantively deficient in that it contains conclusory statements and/or assumptions that AMSCO had directed Krouse's course of medical treatment, that AMSCO was responsible for various petitions filed with the worker's compensation board, and that AMSCO acted with the intent to harass Krouse.

Krouse relies upon *Carparts* as authority for the proposition that Title I of the ADA prohibits discrimination with respect to "terms and conditions" of employment, including fringe benefits and insurance. We note, however, that *Carparts* involved an allegedly discriminatory policy change affecting an employee's health care insurance benefits. Denial of benefits is not the gravamen of this particular claim; rather, it is Krouse's complaint that he was required to undergo a functional capacity exam and utilization reviews. We are unaware of any case, and Krouse does not cite us to one, which has specifically interpreted "terms and conditions of employment" as encompassing these types of events.

Even if it can be said that the functional capacity exam and utilization review processes are properly considered "terms or conditions" of Krouse's employment, however, we do not believe that Liberty Mutual can properly be considered an "employer" on this record under the reasoning set forth in *Carparts*. In *Carparts,* the First Circuit considered whether a trade association, which offered a self-funded medical reimbursement plan to its constituents, and its administering trust could potentially be considered "employers" of the plaintiff within the meaning of the ADA. The court concluded that these entities could potentially be "employers" if they functioned as the participant's employer with respect to health care coverage, "that is, if they exercised control over an important aspect of employment." 37 F.3d at 17. The court explained that it would be relevant under this inquiry to consider whether the defendants had the authority to determine the level of benefits that would be provided to the participants and whether alternative health plans were available to employees through their employment. The court specifically noted that "insurance companies which merely sell a product to an employer but do not exercise control over the level of benefits provided to employees would not be deemed "employers" under this rationale." 37 F.3d

at 17 n. 5. Significantly, Liberty Mutual, as a worker's compensation carrier, does not control the level of benefits provided to injured employees or their decedents, as those levels are statutorily prescribed. *See generally,* PA. STAT. ANN. tit. 77, §§ 431, 511–17, 531, 561, 582–83 (Purdons 1992). In fact, as previously noted, Liberty Mutual is not the final decision-maker with respect to the benefits Krouse would receive under the Workmen's Compensation Act. Thus, under the rationale of *Carparts,* we conclude that Liberty Mutual is not an "employer" or other "covered entity" subject to liability under ADA.[15]

Having determined that there is insufficient evidence to support a finding that Liberty Mutual acted as the agent of AMSCO in the handling Krouse's worker's compensation claim, we also conclude that there is no basis to hold AMSCO liable for this alleged misconduct. Plaintiff has not presented or identified any evidence properly of record which indicates that AMSCO was responsible for—or required Krouse to undergo—a functional capacity exam or utilization reviews. Summary judgment will be entered in favor of the AMSCO and Liberty Mutual Defendants on these claims.

### 3. Plaintiff's ADEA Claims

Krouse has also asserted violations of the ADEA premised upon several of the same episodes of alleged disparate treatment that form the gravamen of his ADA claim: namely, (1) AMSCO's decision to place Krouse on Workmen's Compensation leave; (2) AMSCO's failure to create a special position for him pursuant to Section K of the Collective Bargaining Agreement; and (3) Defendants' alleged acts in requiring that he undergo a functional capacity examination and utilization review. Defendants have moved for summary judgment on these claims contending, among other things, that Krouse cannot establish a prima facie case of discrimination and that he cannot rebut AMSCO's proffered explanation for these actions.

---

15. We note that the court in *Carparts* also indicated that a defendant might be considered an "employer" if it is the "agent" of a covered entity acting on behalf of the entity, or, if the defendant takes action affecting an individual's employment with a third party under circumstances analogous to those in *Sibley.* 37 F.3d at 17–18. For the reasons previously discussed, we do not believe such circumstances can be found on this record.

In a pretext age discrimination case such as this, we apply the familiar burden shifting analysis first established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), and later refined in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Under that analysis, the plaintiff has the burden of establishing his prima facie case by demonstrating that he or she: (1) is a member of the protected age group; (2) was qualified to perform the position at issue; (3) was discharged or removed from the position despite being qualified; and (4) was replaced by another employee sufficiently younger to permit an inference of age discrimination. *Armbruster v. Unisys Corp.,* 32 F.3d 768, 777 (3d Cir.1994); *Siegel v. Alpha Wire Corp.,* 894 F.2d 50 (3d Cir.1990), *cert. denied,* 496 U.S. 906, 110 S.Ct. 2588, 110 L.Ed.2d 269 (1990). If these elements are demonstrated, a legal, rebuttable presumption of discrimination arises and the defendant then has the burden of producing some legitimate, nondiscriminatory explanation for the action. *Burdine,* 450 U.S. at 252–55, 101 S.Ct. at 1093–95; *Siegel,* 894 F.2d at 52–53. Once the defendant does articulate a legitimate explanation, any presumption of discrimination drops from the case and the plaintiff must offer evidence tending to show that the defendant's explanation is a mere pretext for discrimination. *Burdine,* 450 U.S. at 254–55, 101 S.Ct. at 1094–95; *Armbruster,* 32 F.3d at 778.

We address each of these alleged discriminatory actions individually, using the *McDonnell Douglas* analysis.

*a. AMSCO's Decision to Place Plaintiff on Workmen's Compensation Leave*

█ Krouse first claims that his age was a motivating factor in the decision to remove him as channel welder and place him on workmen's compensation leave. The AMSCO Defendants argue that they are entitled to summary judgment on this claim because Krouse can neither establish a prima facie case nor rebut AMSCO's proffered explanation for the decision.

We note that, under Third Circuit standards, "the burden of making out a prima facie case is not onerous." *Fowle v. C & C Cola, a Div. of ITT–Continental Baking Co.,* 868 F.2d 59, 65 (3d Cir.1989) (citing *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94)). *See also Ezold v. Wolf, Block, Schorr and Solis–Cohen,* 983 F.2d 509, 523 (3d Cir.1992)(because the prima facie is easily made out, it is rarely the focus of the ultimate disagreement) (citation omitted), *cert. denied,* 510 U.S. 826, 114 S.Ct. 88, 126 L.Ed.2d 56 (1993).

AMSCO argues that Krouse cannot establish the prima facie element that he was qualified for the position of channel welder. Recently, the Third Circuit has described the prima facie test as requiring a plaintiff to demonstrate merely that he "was qualified by training and experience for the job from which he was discharged." *See Turner v. Schering–Plough Corp.,* 901 F.2d 335, 342 (3d Cir.1990). It has also been observed that an employer's claim that the plaintiff did not meet its performance expectations should not be addressed as part of the prima facie case:

Requiring plaintiff to prove, as part of her prima facie case, that she preclude even the possibility of dismissal for lack of qualification—based only on employers' expectations—would frustrate the purpose of the ADEA. It would require plaintiff, in effect, to prove pretext.

*Gelof v. Papineau,* 648 F.Supp. 912, 919 (D.Del.1986), *aff'd in part, vacated and remanded on other grounds,* 829 F.2d 452 (3d Cir.1987) (citations omitted). *See also Ezold,* 983 F.2d at 523 (where a subjective qualification dispute exists, issue of qualification should often be resolved at second and third stages of *McDonnell Douglas/ Burdine* analysis, in order to avoid putting too onerous a burden on the plaintiff in establishing prima facie case); *Jalil v. Avdel Corp.,* 873 F.2d 701, 707 (3d Cir.1989) (employer's claim that plaintiff was not qualified for position based on insubordination was not something plaintiff had to disprove as part of his facie case, but rather, was more logically a defense to be raised by employer in response to prima facie case), *cert. denied,* 493 U.S. 1023, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990).

In this case, the evidence discloses that Krouse was employed with AMSCO for some twenty years and that he performed the position of channel welder at least from 1989 until January of 1991, when he sustained his back injury. Under these circumstances and, considering the relatively light burden in this Circuit for demonstrating the prima facie element of job qualification, we assume (with some misgivings) that Krouse can establish his prima facie case, including the element that he was qualified to be a channel welder. The record demonstrates that Krouse was within the protected age class, that he was removed from the channel welder position, and that younger individuals were not similarly removed.

▪ Nevertheless, we conclude, based on this record, that the claim cannot survive summary judgment because there is inadequate evidence from which a factfinder reasonably could find that AMSCO's stated reason for placing Krouse on worker's compensation was a mere pretext for age discrimination. AMSCO has explained that it removed Krouse from the position of channel welder because he was physically incapable of performing that job to AMSCO's level of expectation. In support of this contention AMSCO has presented uncontroverted evidence that, despite being prescribed duties that were within his medical restrictions, Krouse's performance efficiency was only 25–30%, as compared to at least 50% performance efficiency exhibited by other fully trained channel welders. AMSCO has also proffered evidence that Krouse's unsatisfactory performance and frequent unscheduled absences due to receiving chiropractic treatment resulted in substantial production delays and increased labor costs for the Company. Given these problems, coupled with Krouse's own admission that he could not perform at any higher efficiency rate without an assistant to help him, AMSCO management concluded that Krouse could not perform the function of channel welder. Because no other positions, including light duty positions, were available, Krouse was placed on workmen's compensation leave and provided full benefits.

Krouse attempts to rebut the foregoing explanation on several points. First, he disputes the fact that any formal performance quota existed. He points to a November 12, 1992 memo from Sid Booker which reads, in relevant part:

We have completed the analysis of the accommodation which you requested in order to perform the essential function of the Channel Welder position. As you are aware, a Channel Welder performs a multitude of different functions encompassing the following:

a) actual channel welding

b) wire spool changes

c) fit and tack

d) load/unload shells

e) cleaning channels and operator inspections

Based on the assessment of our Manufacturing Welding Department, the above-referenced functions are essential for a Channel Welder. At this point, due to your medical limitations you can perform only one essential function of the position, and that is the welding function. The actual welding function only equates to 37% of the overall job function of the Channel Welder. Even with the accommodation, another employee would be performing the other 63% of the job on your behalf.

(Pl.'s Ex. 2.) Krouse points out that there is no mention of specific performance quotas in this memorandum. However, we do not believe this absence is materially probative on the issue of whether AMSCO actually based Krouse's removal on his poor efficiency ratings. The memo does not purport to be an official job description, nor does it purport to contain an exhaustive recitation of the essential functions of the channel welders position. It was apparently drafted in response to a specific request by Krouse for an assistant and it reflects management's concern that such an assistant, given Krouse's physical capabilities, would have to take on some of the essential tasks of the channel welder position. Under these circumstances, the inference which Krouse urges—that his relatively low efficiency rating was not actually a motivating factor in his removal—would be extremely weak at best.

Krouse also points out that he never received any write-ups concerning his performance deficiencies and/or concerning the alleged production delays or increased labor costs, despite the fact that AMSCO's manufacturing operations employees handbook requires a number of written and oral warnings. However, it is not disputed that Krouse received verbal counseling on several different occasions regarding the very problems AMSCO alleges led to his removal from the channel welder position. The fact that Krouse was undeniably counseled, albeit not in conformity with the official handbook procedures, tends to support AMSCO's proffered explanation, rather than undermine it.

Krouse next points out that he was a "day worker," which is defined under the union contract as "a definite rate paid per hour worked, the amount of production not considered to determine the rate." (Ex. 4.) However, as the AMSCO Defendants point out, that document also provides that standards will be established for day work for costs purposes. That is precisely what occurred here: specific production requirements were established on a project-by-project basis. In any event, the mere fact that Krouse's pay rate was not tied to production does not significantly contradict AMSCO's representation that a certain minimal level of production was expected and required of all channel welders and other employees.

Krouse also makes much of the fact that the AMSCO Defendants have produced no corporate documentation of production delays or increased labor costs. Krouse contends that AMSCO's problems resulted from a company shortage of parts, and points to documentation in a "Factory Labor Measurement" for January 1, 1994 through April 24, 1994 which purportedly shows $43,103 in clean-up costs and $16,857 in delay costs, amounting to nearly 20% of the total $389,757 labor cost. Assuming this information is accurate, it does not materially undermine AMSCO's assertion that Krouse's poor performance and absences created production delays and increased labor costs.

Finally, Krouse points to Dan Oler as an example of a younger employee who was injured but treated more favorably than himself in that Oler was permitted to return to work rather than being placed on worker's compensation leave. However, the record indicates that Oler's performance percentages while he was injured were significantly higher than Krouse's and showed a trend of gradually increasing improvement, whereas Krouse's performance did not. During the period from January 2 to May 22, 1994, Krouse's performance percentage remained between 16–30%. Krouse admitted that he could not exceed that rate without assistance. Oler, on the other hand, performed at between 23–85% during the period from January 2 to July 3, 1994. During the last month of his recovery, he remained between 60–85%. (*See* AMSCO Def.'s Ex. 14.) Thus, the fact that Oler was returned to his position does not undercut AMSCO's proffered rationale for placing Krouse on worker's compensation, because Krouse and Oler were not similarly situated individuals. Quite simply, Oler's production efficiency was higher and showed a potential for improvement, whereas Krouse's did not.

In order for an employee to withstand summary judgment after an employer offers a legitimate explanation for its adverse employment action, the employee must produce evidence from which a factfinder could reasonably either: (1) disbelieve the employer's articulated legitimate reasons, or (2) conclude that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's actions. *Fuentes v. Perskie,* 32 F.3d 759, 764 (3d Cir.1994). In order to discredit the employer, the employee:

> must demonstrate such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them "unworthy of credence" . . . and hence infer "that the employer did not act for [the asserted] non-discriminatory reasons."

*Id.* at 765 (emphasis in original) (internal citation omitted).

Viewing the evidence in the light most favorable to Krouse, we find that he has not met this burden. The record is uncontradict-

ed that Krouse could perform at an efficiency rate no higher than 25–30%, unless another co-worker were assigned to help him do his job. Other fully trained channel welders performed at an efficiency rate of 50% or higher. While Krouse claims that certain other workers were provided temporary assistance with their jobs during periods of recovery, there is no evidence that such assistance was ever provided in a situation similar to Krouse's—i.e. where the employee had a permanent disability which would have required over 60% of his duties to be assumed by the assistant. Krouse can point to no other fully trained channel welder who was permitted to carry out his functions at a continuous rate of 30% efficiency or less. Further, it is not disputed that Krouse was frequently and unpredictably absent, and that he admitted he would not be able to pre-schedule his doctor appointments. It is not, in our view, seriously disputed that Krouse's absences resulted in production delays and increased costs to AMSCO. It is undisputed that Krouse was capable of only light duty work, at best, and that no such positions were available at the time of his removal from the channel welder job.

The central issue here is whether a factfinder could reasonably discredit AMSCO's representation that it actually relied upon Krouse's poor performance and frequent absences in removing him from the channel welder position. Based on these circumstances, we do not believe there is sufficient evidence from which a jury could reasonably conclude that AMSCO's stated reasons for placing Krouse on worker's compensation leave were untrue or a pretext for age discrimination.

### b. Failure to Give Plaintiff Consideration for a Section K Position

██ Krouse's ADEA claim is also premised, in part, upon AMSCO's refusal to accord him consideration for alternative employment under Section K of the collective bargaining agreement in September of 1994. The AMSCO Defendants argue that Krouse cannot establish a prima facie case of age discrimination based on this incident because he cannot satisfy the fourth element—that a younger individual was treated more favorably than he.

We agree that Krouse has failed to establish a prima facie case of pretext age discrimination on this claim. AMSCO has offered uncontroverted evidence that, in order to be eligible for a Section K special position as that provision has been interpreted by the UAW and AMSCO, an employee must be at least 55 years of age and have at least 30 years of employment service with AMSCO. Krouse clearly did not satisfy these criteria because he was only 50 years old with 20 years of service at the time he was placed on worker's compensation leave. We therefore conclude that Krouse has failed to establish that he was qualified either for Section K treatment, or for a particular Section K job.

Moreover, there is unrebutted evidence here that AMSCO has historically adhered to its professed practice of according Section K treatment only to employees at least 55 years of age with at least 30 years of service. Krouse does not point to any individual under the age of 55 or with less than 30 years experience who has been awarded Section K consideration in the past. In fact, this would seem logically impossible in view of the fact that AMSCO's stated position was not that Krouse was too old for Section K consideration but, to the contrary, that he was not old enough. Based on the foregoing, Krouse cannot satisfy his prima facie burden of demonstrating that he was qualified for a particular position under Section K (or even for Section K consideration), nor can he establish that a younger individual was treated more favorably than he with respect to Section K treatment.

### c. The Functional Capacity Examination and Utilization Review

██ Finally, Plaintiff asserts ADEA violations based on the harassment which he allegedly suffered by virtue of a requirement that he undergo a functional capacity examination and by virtue of Liberty Mutual's filing numerous petitions before the Pennsylvania Bureau of Workmen's Compensation in connection with his worker's compensation benefits. Krouse's claim arising out of the functional capacity exam is barred for the reason that he admits never having filed an

EEOC charge concerning this allegation.[16] As Defendants point out, the filing of a timely EEOC charge is a prerequisite to invoking federal jurisdiction in employment discrimination claims. *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394 (3d Cir.1976), *cert. denied,* 429 U.S. 1041, 97 S.Ct. 741, 50 L.Ed.2d 753 (1977). Similarly, Krouse admits he never filed an EEOC charge alleging that Liberty Mutual discriminated against him on the basis of age by filing petitions against him.

Beyond these problems, we conclude for the reasons previously discussed in connection with Krouse's ADA claim that there is insufficient evidence properly before the Court to support a finding that Liberty Mutual acted as an "employer" within the meaning of the ADEA.[17] As previously discussed, we conclude that there is insufficient evidence to support a finding that Liberty Mutual acted at the direction of or in concert with AMSCO in requesting the functional capacity exam or petitioning for a utilization review. We do not believe, for the reasons previously discussed, that Liberty Mutual is otherwise properly considered an "employer" for purposes of Krouse's ADEA claim. Additionally, Krouse has not presented or identified any evidence properly of record which indicates that AMSCO was responsible for—or required Krouse to undergo—a functional capacity exam or utilization reviews.

██ Finally, there is inadequate evidence on this record in any event to support a reasonable inference that the functional capacity exam or utilization review were motivated by an age-based animus. Krouse vaguely asserted at deposition that he based this particular claim on the fact that other, younger employees at AMSCO were not required to undergo utilization reviews and/or functional capacity exams. However, Krouse admitted that none of these younger individuals had sought chiropractic care to the extent he had—i.e. two to three visits per week for a period of almost four years. Although under *Texas Dept. of Comm. Affairs v. Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093–94, the burden of establishing a prima facie case of disparate treatment is not onerous, at the very least the plaintiff must point to some adverse employment action that occurred under circumstances giving rise to an inference of unlawful discrimination. *Id.* We conclude that summary judgment in favor of Defendants is warranted on this claim.

**B.** *The AMSCO Defendants' Motion to Strike Plaintiff's Affidavit*

Krouse has submitted out of time, and without leave of court, an affidavit which purportedly supplements his brief in opposition to summary judgment. The AMSCO Defendants have moved to strike the affidavit on the grounds that the affidavit contradicts Krouse's prior sworn testimony; it does not comply with the requirements of Fed. R.Civ.P. 56(e); it is untimely, and it does not properly support Krouse's brief in opposition to summary judgment.

██ Upon review of Krouse's proposed affidavit and the arguments of respective counsel, the Court agrees that the affidavit is inappropriate and should be struck. For one, Krouse's affidavit is untimely. On February 20, 1996, Defendants filed their respective motions for summary judgment. Krouse was given until March 12, 1996 to respond to the Liberty Mutual Defendants' motion and until March 14, 1996 to respond to the AMSCO Defendants' motion. Krouse filed his briefs on those dates, having conducted no discovery and having submitted no affidavits with his brief. Although the Court permitted the AMSCO Defendants to file a reply

---

**16.** Although Krouse alleges in his complaint that he received a notice of right to sue from the EEOC on October 11, 1994 (*see* Krouse II Complaint, Def.'s Ex. 6, at ¶ 37), there is no evidence in the record, beyond this bald assertion, that this notice was received or that an EEOC charge concerning this claim was filed.

**17.** Because Title VII, ADEA and ADA contain very similar definitions of the term "employer,"

*see* 42 U.S.C. §§ 2000e(b) and 12111(5)(A) and 29 U.S.C. § 630(b), case law interpreting that term within the meaning of any one of these statutes is relevant in determining whether liability exists under Title VII, ADA or ADEA. *See Heinz v. Belcan Engineering Corp.,* 68 Fair. Empl. Prac. Cas. (BNA) 1238, 1995 WL 606789 at * 2 n. 1 (W.D.Pa. Aug.16, 1995). Accordingly, our analysis of this issue in connection with Krouse's ADA claim is applicable here.

brief in support of their motion on April 3, 1996, the Court determined that further briefing was unnecessary and it therefore denied Krouse's request to file a surreply. Krouse then proceeded to file his affidavit on April 10, 1996 without leave of Court. The Court's June 1, 1995 case management order makes clear that affidavits and other documents in opposition to a dispositive motion are to be submitted *together with the party's opposing brief.* (*See* Case Management Order dated 6–1–95, Doc. No. 9, at ¶3(c).) Krouse's affidavit, filed some four weeks after his briefing deadlines, is now untimely.

■■■ Moreover, Krouse's affidavit is inappropriate because it does not comply with the requirements of Rule 56(e) of the Federal Rules of Civil Procedure. Rule 56(e) states that supporting or opposing affidavits "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Further, "[s]worn or certified copies of all papers or parts thereof referred to in an affidavit shall be attached thereto or served therewith." *Id.* Krouse's affidavit contains conclusory and self-serving allegations [18] and relies upon unsworn and uncertified copies and/or excerpts of documents, much of which constitutes inadmissible hearsay evidence.[19]

■■■ We also agree with the AMSCO Defendants that the affidavit, though purportedly offered under Rule 56(e) to supplement Krouse's brief in opposition, inappropriately raises new allegations. For example,

Krouse's affidavit alleges that AMSCO refused to allow him to seek treatment on company time (¶ 20). This issue was not heretofore addressed by Krouse. Further, Krouse's brief does not in any way rely upon or incorporate the affidavit. Thus, it cannot be said that Krouse's affidavit properly supports his brief in opposition.

■■■ Krouse relies on the language of Rule 56(e) which states that: "[t]he adverse party prior to the day of hearing may serve opposing affidavits." He suggests that, because this Court has not held oral argument on Defendants' summary judgment motions, his affidavit is still timely. However, the Court explicitly indicated in its pretrial orders dated February 21 and 26, 1996 [Doc. Nos. 35, 37] that it was intending to dispose of Defendants' summary judgment motions without oral argument, unless argument was deemed necessary. The Third Circuit has indicated that, although Rule 56 speaks of a "hearing," oral argument is not required and an opportunity to submit evidence and arguments in writing satisfies the rule. *Anchorage Assoc. v. V.I. Bd. of Tax Review,* 922 F.2d 168, 176 (3d Cir.1990). Such an opportunity was provided here. We emphasize again that, in its June 1, 1995 case management order, the Court made quite clear that any opposing evidence in response to a dispositive motion was to be submitted *together with the opposing brief.* Although the Court subsequently extended the deadlines for briefing the summary judgment issues, the Court never abandoned its requirement that materials relative to dispositive motion be

---

18. As examples, Plaintiff avers: that he requested various reasonable accommodations to the channel welder position (¶ 4); that he was "forced onto Worker's Compensation" by AMSCO and Liberty Mutual (¶ 6); that he had the ability to perform the essential job functions of channel welder (¶ 7); and that AMSCO forced him out of employment based on his age and disability (¶ 20).

19. Krouse contends that the statements by Mike Crocker, Richard Van Hoozer, Daniel Oler, Dana Smith, Richard Stebell and Terry Pierce attached to his affidavit are not hearsay but admissions by a party opponent with the meaning of Fed. R.Evid. 801(d)(2)(D). That rule provides that statements offered against a party are not hearsay if they are statements by the party's agent or servant concerning a matter within the scope of

his agency or employment, made during the existence of the relationship. Krouse suggests that, because AMSCO received these statements through discovery and never affirmatively denied the truth of the statements themselves, AMSCO has somehow adopted them through its silence. This argument is unavailing inasmuch as AMSCO has no duty to affirmatively deny the truth of unsworn statements submitted to it during the course of discovery. Its silence in this regard therefore does not amount to an admission. Moreover, the Court cannot agree that the statements constitute admissions within the meaning of Rule 801(d)(2)(D). In making these statements, the declarants were not acting on behalf of AMSCO or in the natural course of their duties as agents of AMSCO.

filed together with the supporting or opposing brief.

Krouse also strongly disputes the Defendants' argument that the affidavit contradicts his own prior sworn testimony. However, we have concluded that there are adequate alternative bases which justify granting the Defendants' motion to strike. Krouse's other arguments in defense of his affidavit are unconvincing. We will therefore grant the AMSCO Defendants' motion to strike Krouse's affidavit.

C. *Plaintiff's Motion for Leave to File Supplemental Briefs in Opposition to Summary Judgment, to Re–Open Discovery, and to Consolidate*

We next consider Krouse's motions to reopen discovery, to submit supplemental briefs in opposition to Defendants' motions for summary judgment, and to consolidate these cases with two other consolidated civil actions currently pending before this Court.[20] In support of his motion to reopen discovery, Krouse submits that his counsel has recently obtained evidence through the sworn testimony of Defendants' management level employees that directly contradicts earlier assertions made by the Defendants in their briefs. This "newly discovered evidence" allegedly contradicts the Defendants' previous assertions that there is no agency relationship between AMSCO and Liberty Mutual and that all decisions regarding AMSCO employees are made solely by AMSCO, while all decisions regarding worker's compensation issues are made solely by Liberty Mutual. Specifically, Liberty Mutual has contended that its only relationship with AMSCO is by virtue of furnishing a policy of insurance to AMSCO and that it does not otherwise exercise any control over decisions affecting AMSCO employees. AMSCO contends that the decisions that Krouse undergo a functional capacity exam and a utilization review were made not by AMSCO, but by Liberty Mutual, its worker's compensation

carrier. Krouse submits that recent deposition testimony taken on April 25, 1996 in the *Cassidy* cases directly undercuts these assertions. He urges that this newly discovered information "only scratches the surface of the underlying, secret actions and agendas of the Defendants." He claims that additional discovery is needed to unearth all the relevant information concerning the Defendants' relationship.

Having considered the foregoing arguments, the Court finds that Krouse's motion for additional discovery is not well taken. As an initial matter, we note that the Complaint in *Krouse II* was filed on November 10, 1994 and the time for discovery continued for nearly twelve months thereafter, the deadline originally being set to November 1, 1995.[21] By order dated October 30, 1995, this Court extended the discovery deadline to January 5, 1996. Krouse moved for an additional extension of discovery on January 5, 1996, but the Court denied that motion. Thus, the period for discovery, which was quite liberal to begin with, is now well passed. Krouse freely admits that he has conducted virtually no discovery during this fourteen month period. He offers no explanation for having failed to conduct discovery and does not indicate any reason why the "newly discovered evidence" was previously unavailable. The parties have already submitted lengthy briefs in support of and in opposition to dispositive motions. We see no good reason to further protract this litigation by now reopening discovery and permitting further briefing in these actions.

A party seeking to reopen discovery in response to a summary judgment motion must demonstrate: (1) the particular information sought, (2) how the information would preclude summary judgment, and (3) why it has not previously been obtained. *Pastore v. Bell Tel. Co. of* Pa., 24 F.3d 508, 511 (3d Cir.1994); *St. Surin v. Virgin Islands Daily*

**20.** Plaintiff seeks to consolidate these actions with Civil Action No. 95–2 Erie, styled *William J. Cassidy v. American Sterilizer Company,* and Civil Action No. 95–62 Erie, *William J. Cassidy v. American Sterilizer Company, Liberty Mutual Insurance, Company.* The *Cassidy* cases assert

ADA and ADEA claims against AMSCO and Liberty Mutual similar to those asserted here.

**21.** In fact, *Krouse I* was filed even earlier, on October 21, 1993. Discovery ran in that case until February 28, 1995.

*News, Inc.,* 21 F.3d 1309, 1314 (3d Cir.1994). We find that Krouse has failed to adequately explain how his counsel's newly acquired information would preclude summary judgment. We further find that Krouse has not provided a reasonable explanation as to why this "newly discovered evidence" was not previously obtained. Consequently, his motions to reopen discovery and to supplement his prior briefs will be denied.

In light of the Court's resolution of Defendants' summary judgment motions and our determination that a re-opening of discovery is inappropriate, Krouse's motion to consolidate will be denied as moot.

### ORDER

AND NOW, this 28th day of September, 1996, for the reasons stated in the accompanying memorandum opinion,

IT IS HEREBY ORDERED as follows:

1. The Motion [Doc. No. 32–1] of Defendants Liberty Mutual, Stafford, and Nuara for Summary Judgment is GRANTED.

2. Defendants American Sterilizer Company, Michael J. Coughlin, Scott Lightner, and John T. Hardin's Motion [Doc. No. 36–1] for Summary Judgment is GRANTED.

3. The AMSCO Defendants' Motion [Doc. No. 49–1] to Strike Plaintiffs' Affidavit and Deny Plaintiff's Request for Reopening of Discovery and Motion [Doc. No. 49–2] for Sanctions Under Fed.R.Civ.P. 56(g) is GRANTED as to [49–1] and DENIED as to [49–2] consistent with the accompanying memorandum opinion.

4. The Plaintiff's Motions [Doc. No. 51–1] for Leave to File Supplemental Briefs in Opposition to Summary Judgment, [Doc. No. 51–2] to Re-open Discovery and [Doc. No. 51–3] to Consolidate are DENIED with prejudice.

5. Plaintiff's Motion [Doc. No. 60] in Opposition to Defendants' Motion to Strike Plaintiff's Affidavit and Deny Plaintiff's Request for Re-Opening of Discovery and Motion for Sanctions is DENIED as moot.

6. Defendants Coughlin, Lightner and Hardin's Motion [Doc. No. 17–1] to Dismiss is DENIED as moot.

7. The Motion [Doc. No. 20–1] of Nanette S. Stafford and Jason M. Nuara, Defendants, to Dismiss is DENIED as moot.

JUDGMENT is hereby entered in favor of all Defendants, and against Plaintiff, Robert Krouse, as to all claims.